UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.                                          Crim. No. 3:25-CR-30 (SVN)

JAMES SCHWAB                                 May 23, 2025

**GOVERNMENT'S REPLY BRIEF**

The Government respectfully submits that it has satisfied its burden demonstrating that the defendant is a risk of flight by a preponderance of evidence, a danger to the community by clear and convincing evidence and submits that there is no combination of conditions that can reasonably assure either the defendant's appearance or safety of the community.

In addition to what the Government included in its opening brief, it has learned (and since corroborated) that the defendant has identified one of the Government's potential witnesses as a cooperator to others inside Wyatt, where the most dangerous federal defendants from the region are housed. Not surprisingly this information has since made it back to the Government's potential witness (housed at a different facility) via a recently convicted murderer confronting him. This is perfectly illustrative of why the defendant, an individual who engages in violence through others, cannot be trusted to adhere to even the stringent conditions of release set by the Honorable S. Dave Vatti. The defendant ought to be detained.

I.          **Defendant's Misconduct, Assets, and International Connections**

In his brief, the defendant is unable to address adequately the serious and significant nature of the allegations. To reiterate: the defendant planned and orchestrated the violent kidnapping and carjacking that resulted in a ring from Miami violently abducting an elderly couple. One victim was beaten with a bat. Both were duct-taped and thrown into the back of a white van. The purpose

1

of this kidnapping was to extort their grown son who was believed to have stolen hundreds of millions in cryptocurrency from a single victim. And while the parties may disagree about the meaning of the term "orchestrate," the defendant: (1) directed one of the kidnappers, Angel Borrero, to fly to New York; (2) he arranged to pay for Borrero's travel expenses using a credit card in the name of someone whose identity and airline miles he had stolen; (3) he paid for the Airbnb in a secluded area in Roxbury, CT – to which the carjacking ring planned to take the abducted couple to extort their son; (4) he did so using a fabricated entity; (5) he made a fraudulent credit card number available to Borrero to buy supplies as needed for the kidnapping; and (6) he used a fraudulent card to fly in another ring from St. Louis the days before who were supposed to force their way into the victims' home in Danbury.

This is not the only incident in which the defendant attempted to use others to engage in violence to target the couple's son. In an incident that predated the charged offense, on July 6, 2024, the defendant tried to arrange for one of the eventual carjackers, Diaz, to shoot the son with whom he had fought in a club that evening. In that exchange, which happened via Telegram (an end-to-end encrypted app), the defendant confirmed the address of his intended victim, said that he wanted them "outside" and "[n]ot just shooting the house." Diaz told him that he was "trying to lock in gun situation" and the defendant responded "Kk just lmk." Later, the defendant told Diaz "you need to hit [t]he circle kid" and that it "[n]eeds to be recorded." Eventually, the defendant and Diaz agreed that Diaz should rob him instead of killing him (referred to as a "hit") and discuss the son's security arrangements. The defendant tells Diaz to be on the lookout for straps and tells him he would fund any expenses needed afterwards. During the conversation he identifies the son

2

by name and admits that he wanted to go after the son and the people he was with previously in Los Angeles.[1] *See* Gov't Ex. A (redacted version of this exchange).

Beyond this, the defendant has engaged in various internet-related fraud schemes, computer hacking and SIM swapping. He uses Discord and Telegram to connect to others who do the same. He stole multiple American Airlines miles from individuals. And he had at least five different fake IDs that were identified through CashApp and Paypal returns.

Moreover, the defendant has significant assets at his disposal. As recounted in its opening brief, the defendant signed a lease on an apartment that required a monthly payment of $55,000. He paid $330,000 in cash for rent and a security deposit without any verifiable employment or evidence of legitimate business. He has thousands of dollars in jewelry. He cosigned with other fraudsters. He has access to individuals who can create fake identities for him. He has traveled to Qatar, Saudi Arabia, and the UAE in the recent past – each of which have no extradition treaty with the United States. He has internet associates abroad as well.

What these facts demonstrate is that the defendant: (1) does not hesitate to use other people to engage in violence and has at least contemplated ordering a murder; (2) tries to hide his involvement in crime by using other people, fake identities, and shell entities; (3) is technologically savvy in connecting with others to achieve these ends; and (4) has significant assets and ties abroad. It is through this lens that the relevant detention factors and the proposed conditions must be analyzed.

---

[1] Law enforcement recently discovered this exchange in an extracted phone. Notably, Judge Vatti did not have the full benefit of this exchange before him at the last detention hearing, though it was orally proffered in passing. *See* Tr. at 10.

## II.          The Detention Factors

Each of the factors that the Court must weigh in determining whether there are conditions that can reasonably assure the appearance of the defendant or the safety of the community weigh in favor of detention. *See* 18 U.S.C. § 3142(g).  And the defendant's arguments to the contrary are not persuasive.

- With respect to the nature and circumstances of the offense, 18 U.S.C. § 3142(g)(1), the defendant concedes, and the Government agrees that it is serious. Def't Br. at 8-9. It is also a crime of violence. Judge Vatti also agreed. *See* Doc. No. 49.

- As to the weight of the evidence, 18 U.S.C. § 3142(g)(2), the defendant can only point to the fact that this factor is sometimes given the least weight. *Id.* at 9. Notably, Judge Vatti agreed that "the evidence against the defendant is strong." Doc. No. 49.

- As to the defendant's history and characteristics, 18 U.S.C. § 3142(g)(3), the defendant argues it is of no consequence that he has no ties to Connecticut and instead focuses on the defendant's ties to Georgia. *Id.* at 9-10. But it is not the defendant's ties to Georgia rather than Connecticut that animates the Government's concern: it is his sordid and lengthy history of criminal misconduct, including dalliances with violence, that is problematic. *Id.* at 10. And while it is true that he has not been charged for those offenses (yet), it does not make the underlying acts any less concerning. Indeed, Government's Exhibit A speaks for itself. His decisions to repeatedly engage in this sort of misconduct (and the advanced steps he takes to conceal it) result in this factor weighing in favor of detention.

**III.** **Dangerousness and New Misconduct**

With respect to the dangerousness factor, 18 U.S.C. § 3142(g)(4), the defendant's argument is that the conditions are adequate to address any future misconduct. Def't Br. at 11. To be clear: the Government stands by its original assessment that the nature, quantity, and breadth of the crimes involving electronic devices the defendant has committed pushes this factor into weighing in favor of detention, but the additional information the Government has uncovered since the detention hearing in front of Judge Vatti confirms that the defendant should be detained.

One of the Government's potential witnesses ("CW") that is currently detained was approached by an individual in early April that has recently been convicted of murder ("Individual-1"). Individual-1 confronted CW about being a cooperator. He showed him a message he purported to receive from an individual ("Individual-2") currently at Wyatt who had previously been housed with CW. According to CW the message Individual-2 had sent to Individual-1 said to stay away from CW and that CW was "the boys" or working with law enforcement. Although CW denied it, he felt threatened, and the Government has since taken steps to protect CW.

CW identified both Individual-1 and Individual-2. And the Government has since been able to locate the following message that Individual-2 sent from Wyatt to a woman on March 24, 2025 that said as follows: "Send this to my boy [Individual-1] . . . tell everyone to stay away from [CW] he the boys that's stamped by his codee up here!!" *See* Gov't Ex. B. The same woman sent that message verbatim (apparently copied and pasted) to Individual-1 who is housed with CW on April 8, 2025.

Notably, the only one of CW's "codees" or codefendants at Wyatt is the defendant here, James Schwab.

These facts demonstrate that the defendant has identified CW as a potential Government witness at Wyatt, which houses some of the most dangerous federal defendants from Connecticut, Massachusetts and Rhode Island. As the Court is aware, retaliation against cooperating witnesses is an enormous concern that happens with alarming frequency in cases involving violence. The defendant is a smart man – he, like anyone else with common sense, is aware of the consequences of identifying a cooperator to violent individuals. His decision to nonetheless identify a government cooperator has put CW at significant risk, which has required the Government to take remedial actions. This new information, that Judge Vatti did not have before him, demonstrates that the danger poses a serious risk of danger. It also reaffirms that the Court simply cannot trust the defendant to abide by the conditions of his release.

## IV.        Risk of Flight

Finally, the Government stands by its arguments in its opening brief that the defendant is a risk of flight. He faces significant penalties and the evidence is strong. *See* Doc. 49.  He has access to assets and connections abroad. Indeed, Judge Vatti agreed that he was a risk of flight. *Id.*

## V.        The Proposed Conditions

Fundamentally release on conditions is a question of trust. No condition can actually stop any defendant from harming individuals in the community or from fleeing if released. Setting conditions require confidence that the defendant will adhere to them based on his or her understanding of the consequences of failing to do so; consequences either to others (if there is a bond) or to his liberty (if re-apprehended). While perhaps self-evident, this is no small point given the nature and seriousness of the offense conduct and the defendant's history and characteristics. The defendant has engaged in violence and contemplated murder. His actions illustrate that he plainly understood the potential consequences to his liberty by participating in criminality. Those

consequences did not, however, dissuade him from engaging in those activities. Instead, they caused him to take steps to conceal his involvement by using other people, end-to-end encrypted apps, fake IDs, and shell companies to obfuscate his participation. He also used and offered to use the significant resources at his disposal to do so. This undercuts any confidence the Court should have that going to jail if he violates his conditions would deter him.

In other words: he simply cannot be trusted.

It is through this lens that the proposed conditions of release ought to be considered, and, respectfully, they are insufficient. There are simply *no* conditions that can adequately guard against the danger to the community or risk of flight.

For instance, with respect to the location monitoring, the defendant would only have to remove the bracelet to be at liberty. And while probation would be notified of such an incident, it could take days or weeks for the Government to obtain a warrant to locate the defendant. That is more than sufficient time for the defendant to obtain a phone, access funds, abscond, or perpetrate some other crime.

As to the personal residences, while his parents would undoubtedly lose their homes, it is clear from the record that the defendant has access to significant assets. He has stolen cryptocurrency. He signed a $55,000 per month lease and put down $330,000 in cash in connection with that lease. Against that backdrop the residences cannot be said to have the deterrent impact they might otherwise.

Likewise, the condition prohibiting the defendant from accessing an internet capable device is only ink on paper without confidence that the defendant will abide by the order. His savviness in accessing the internet is clear from the record. He could conceivably circumvent the passwords to one of his parents' devices or otherwise obtain one and hide it from his parents.

7

Even having his parents at home, while a reasonable condition, requires the defendant not to walk out the door despite their protestations.

The record indicates that the defendant has made bad decisions repeatedly with wanton disregard for any potential consequence of his actions. There is every reason to think he would do so here again. Stated differently, his actions speak louder than words: He will not abide by any conditions of release.

The defendant's arguments that the conditions are sufficient are without merit. For instance, the defendant argues that he could not cover his family's losses if he absconded because that would require access to the internet, which is forbidden by the conditions. Def't Br. at 16. Of course, if the defendant flees or violates, it is unlikely that he would stop himself from getting an electronic device because the Court ordered it. Similarly, the defendant argues that if he cut his bracelet, probation would be notified. *Id.* True enough, but that does not mean that the defendant would be taken into custody immediately. To the contrary it can take weeks or months to find an absconder. By then the defendant, who has access to people who make fake IDs, could be in another state or perhaps country.

## VI.    Conclusion

In short, as Judge Vatti found, the defendant poses a danger to the community and a risk of flight. The proposed conditions do not, however, reasonably assure the appearance of the person as required and the safety of any other person or the community.

Accordingly, the Government respectfully requests that the release order be vacated, and

the defendant be detained pending resolution of his criminal charges

Respectfully submitted,

DAVID X. SULLIVAN
UNITED STATES ATTORNEY

      /s/

JOHN T. PIERPONT, JR.
ASSISTANT UNITED STATES ATTORNEY
157 CHURCH STREET, 25TH FLOOR
NEW HAVEN, CT 06510
FEDERAL BAR NO. phv07973
Tel.: (203) 821-3700
Fax: (203) 773-5378
John.pierpont@usdoj.gov

**CERTIFICATION**

I hereby certify that on May 23, 2025 a copy of the foregoing was filed electronically, sent via e-mail to defense counsel, and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/
JOHN T. PIERPONT, JR.
ASSISTANT UNITED STATES ATTORNEY
