UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

_____
                                |
USA,                            | No. 3:25-cr-00030-SVN-1
                   Plaintiff,   |
v.                              | July 15, 2025
JAMES SCHWAB,                   |
                   Defendant.   | 12:11 p.m.
_____|
                                  Hartford, Connecticut


                         BOND HEARING


B E F O R E:
        THE HONORABLE SARALA V. NAGALA, U.S.D.J.

A P P E A R A N C E S:
For the Plaintiff:
        KAREN PECK
        DOJ-USAO
        1000 Lafayette Boulevard, 10th Floor
        Bridgeport, CT 06640
        203-668-3905
        Email: karen.peck@usdoj.gov

For the Defendant:
        ALLISON MURRAY NEAR
        Jacobs & Dow
        350 Orange Street
        New Haven, CT 06511
        203-772-3100
        Email: anear@jacobslaw.com




Courtroom Deputy:                    Court Reporter:
Sammii Bergeson                      Cassie Zayas, RPR


                  Chambers:  860-240-3873

(Call to order, 12:11 p.m.)

THE COURT:  Good afternoon.  We're here in case number 25-cr-30, *United States of America versus James Schwab*.

Let's start with appearances of counsel, please.

MS. PECK:  Good afternoon, Your Honor.  Here for the government is Assistant U.S. Attorney Karen Peck.

THE COURT:  Good afternoon.

MS. NEAR:  Good afternoon, Your Honor.  Allison Near for Mr. Schwab, who's here with me at counsel table.

THE COURT:  Good afternoon to you, Attorney Near.  Good afternoon to you, Mr. Schwab.  I will also note we have Officer Wentz from the U.S. Probation Office present in court today.

What's the status of Mr. Schwab's parents arriving?

MS. NEAR:  It looks like their flight arrived a little late.  That's the only reason I have the phone on my desk.  They're in the Uber and their ETA is 12:27.

THE COURT:  All right.  So we can do some pieces without them, and there are some that we will need them for.  I delayed for a few minutes waiting for them, but I can at least hear legal argument, if there is any, and take questions about the proposed conditions of release.  I had sent through Courtroom Deputy Bergeron the draft

that I'm contemplating.

So let me first hear -- I assume the government maintains its objection to any release. But if there are specific comments to the proposed conditions, I'll hear them now from the government.

MS. PECK: Yes, Your Honor. We obviously do preserve our objection. But as far as I can recall and from my notes, I think that the proposed order and conditions are consistent with what the Court has indicated previously. And so I'm not proposing any change.

THE COURT: All right. And I have on the bench here a copy of the letter that contains a list of names of people that Mr. Schwab should not contact, in the government's view.

Can I confirm that that letter has been provided to Attorney Near and to Mr. Schwab?

MS. NEAR: Yes. It was on our counsel table, Your Honor.

THE COURT: Okay.

MS. PECK: I should note, Your Honor, I had emailed this list to Attorney Near earlier.

MS. NEAR: Yeah. I got it last night, Your Honor. I will note that there's one individual in particular, what I was told, Mr. Schwab's girlfriend is on

the list.  I was told that there were some reports or some indication as to why she is on this list.  I still have not seen any of that.  And obviously she's been an important support for Mr. Schwab during his time in incarceration and will continue to be an important support.  So I am concerned about her on the list, and I still don't quite understand or I haven't seen any documentation to support her being on this list.

THE COURT:  Okay.  So do you object to her being on the list?

MS. NEAR:  Yes, Your Honor.

THE COURT:  All right.  Attorney Peck?

MS. PECK:  Yes.  We put her on the list for the same reasons we put individuals who are not currently charged in the case on the list.  We have database information that has been checked by the agents during their investigation about people who had participated in various kinds of fraudulent conduct with or alongside Mr. Schwab, and in particular some of the American Airlines related fraud involving hacking into people's American Airlines miles accounts, using those miles for travel.  Ms. Waits has been reported to the FBI complaint line about her being a part of that along with some of the other names on this list.

And so, you know, we are obviously concerned

about anybody who has got those kind of inclinations and, having the experience with Mr. Schwab of engaging in this type of fraudulent conduct, being in contact with him during this time.  And so she's on the list for the same reason that the other four that precede her are on the list.  The others are on the list because they either have been currently charged as a co-conspirator in the crime at issue or we anticipate that they will be charged.

And so, you know, I regret that she's his girlfriend and that's the issue, but she is no different than the other names as far as the basis for why we've included her.

THE COURT:  All right.  And when you say that she's been reported to the FBI for fraudulent activity, can you just clarify whether conduct that the government believes she's engaged in has been reported to the FBI or if her name in particular had been advanced as a person who might be involved in --

MS. PECK:  Her name in particular has been advanced with other names on this list as being involved in the same fraudulent conduct as Mr. Schwab and, you know, Juda, Savvy, and these others.

THE COURT:  Okay.  Attorney Near, do you wish to be heard?

MS. NEAR:  Yes, Your Honor.

So I will say that the discovery I received to date, the other names I have at least seen somewhere in the discovery, I'm not going to concede that they were involved or that they have engaged in any criminal conduct. But I've seen nothing with his girlfriend's name.

And even this morning, Attorney Peck wrote and said, I'll show you the documents that substantiate this. I still haven't seen anything. And so I don't quite understand. Her name only arose after the first bond hearing when he was ordered released, and then she was kind of added to this list. Her name never came up prior to that time as somebody who would be problematic as being in Mr. Schwab's life. So I still don't understand if it's as easy as, here's the documentation to substantiate the government's claim why I would -- despite asking -- I mean, I think the original list was due June 20th. I haven't seen anything, even despite Attorney Peck's email this morning. So I don't know where the information comes from. I don't know the context. I don't know if her name is listed on the plane ticket. That may be something that she was not involved in. I have no idea because I've not been able to get any information about it.

THE COURT: Okay. So based on the government's representation that Ms. Waits had been identified by name

to the FBI as a person involved in fraudulent activity, I am going to keep her included on this list for the time being.  But I'm also going to require that the government produce any justification it has for inclusion of her name on the no-contact list within 48 hours from now.  So that would be on July 17th at noon.  That needs to be provided to the defense.

And after reviewing that information, A, if you deem it incomplete, let the Court know or actually confer with the government first about that before raising it to the Court's attention.  But if you seek to modify the condition to remove Ms. Waits from the no-contact list or to tailor the subject matter in -- about which he can communicate with her, you can file a motion to modify the condition at that time.

MS. NEAR:  Okay.  And -- thank you, Your Honor. And I'll just note that, to be clear, I'm not asking for her to be a visitor, you know.  It was just a -- at this point, this was just a question of contact, him being able to talk to her on the phone.

THE COURT:  Where does she reside?

MS. NEAR:  She resides out west.  She's not anywhere near Georgia.  I mean, I think in one of a couple of west coast states.  But she's not here.  We're aware of the Court's parameters around visitors, but in a -- again,

she's been a -- they've been in a relationship for some time.  She's been a tremendous support to him, and we're just trying to make sure he has the support he needs to be successful on release.

THE COURT:  Okay, I understand.  So I'll entertain a motion to modify the conditions at the appropriate time.

MS. NEAR:  All right.  Thank you.

THE COURT:  If one is made.

That sort of leads me to a question about an explanation about the telephone conditions that I had imposed.

There had been a question posed to the Court through probation by Mr. Schwab about possession of a flip phone.  And after discussion with the probation office, it doesn't appear that flip phones can be monitored using the probation office's software capabilities.  And so I have prohibited the use of a flip phone cellular device even if that phone could not access the internet.

But obviously I want to ensure that Mr. Schwab has the ability to communicate with you, Attorney Near, or his other lawyers on this case.  And so I wanted to understand what the plan is for communicating with him without the use of the internet, effectively, or a device that could access the internet.

MS. NEAR:  Sure, Your Honor.  Attorney Vatti --
withdrawn.

Magistrate Judge Vatti is the one who had
actually proposed a flip phone.  In my view, I had talked
to Officer Wentz about this a little bit this morning
because I thought the benefit of a flip phone -- which, I
had another electronic monitoring case.  It was actually a
kidnapping-robbery case.  It had allowed probation to open
up the phone and confirm that the numbers dialed were
consistent with the numbers that this defendant was
permitted to contact.

You know, I understand that technically those
numbers, you know, a call could be deleted, a text could
be deleted.  But there are, you know, cell phone records
we routinely get in cases that would log every single call
that was made and every text message.  And we thought the
benefit of that is that that actually also enabled the
parents kind of in real time to even go in themselves and
say, who did you just talk to?  They can't do that on a
landline.  I mean, you can request records, but they
actually have less ability to monitor any calls with the
landline than they would with a flip phone.  And same with
probation.  So that's why we thought the flip phone was a
better avenue.  They don't have a landline.  They would
have to get one installed.  And I don't -- I don't know

anybody who's had a landline in 20 years, so I don't even know what that requires.  They are in kind of a rural area.  I don't know if that's something that can be done overnight or they get a date three weeks from now.

But in the short-term, if Your Honor is not inclined to let him have a flip phone, I am very concerned about his ability to reach out to me.  And I appreciate Your Honor acknowledging that because I find that my clients are most successful on release if they can call and ask me anything.  I always say there's no dumb question.  I would rather you call me at midnight and say, I'm just double-checking it's okay to watch a movie on Netflix if my parents are in the room.  I would rather them call me than not call me at all.  So in the short-term, if she's restricted to a landline, he can't make a call until that landline is put in.  He could presumably have a speakerphone call on one of his parent's phones if they're present.  That conversation would not be privileged.  I think in a pinch we would make it work if that was his only avenue.

So my -- I had thought that the flip phone actually allowed for greater supervision than a landline and also gave him the ability to have some privacy and be able to reach me.  You know, if he's in his bedroom and he calls me late at night, he doesn't have to wake up a

parent.  He has that flexibility.

So in terms of reviewing discovery and meeting with us, Attorney Cristalli does have an office in Atlanta.  It's about two hours away.  It's not -- so it's not practical to say, I need to call my lawyer.  Mom, can you drive me to Atlanta?

But for the purposes of reviewing discovery, if he was given -- you know, in an attorney's office under the supervision of a paralegal or an attorney, allowed to have a Zoom meeting where we can review discovery remotely, that is an avenue.  I mean, it's not -- it's not ideal for the long-term.  But I think in the short-term with these restrictive conditions, if probation had the authority to allow Mr. Schwab to go to Atlanta for the purposes of those meetings without us having to come back to the Court, then I think that that is a short-term solution.  I've talked to Mr. and Mrs. Schwab about that.  Again, it's not a big deal to drive back and forth to Atlanta.  But if he was going to go for a period of hours to meet with counsel, we would schedule those in advance so probation would have sufficient notice.  I think that is a way for us to allow him to continue to talk to us about discovery.  As Your Honor knows, the discovery is voluminous.  It's cell phone extractions.  There's videos.  But that would be a way for us to accomplish that.  The

more immediate and short-term problem is his ability to just call and ask the stupid question.  Or if he's concerned something happened and he doesn't want to make any guesses as to whether it was okay or not okay, I would always rather maximize my client's ability to call me quickly than feel that he would wait and see and try to figure it out himself.

THE COURT:  Okay.  Let me hear the government's perspective on the two issues.  The first is the use of a flip phone that doesn't access the internet for purposes of attorney calls, and then the second is having the conditions allow for travel to Atlanta for Zoom meetings with his attorneys in some sort of supervised fashion where he's -- what I'm contemplating is he would not ever have access to an electronic device without some supervision, so someone would need to be sitting in the room with him from this law firm to ensure that that wouldn't happen.

Let me hear the government's perspective.

MS. PECK:  As to the latter, Your Honor, as long as he was in the supervision of a parent as the custodian to get to Atlanta --

THE COURT:  Yes.

MS. PECK:  -- you know, I don't object to that.

THE COURT:  Okay.  And then under the

supervision of an attorney or member of the staff?

MS. PECK:  An attorney or a paralegal, that's correct.

THE COURT:  For those Zoom meetings.  Okay.

MS. PECK:  As to the other -- I have a landline, just to say.  I don't have great cell phone reception where I am.

So I assume the probation office has the ability to monitor a landline more easily.  Is that a safe assumption?

THE PROBATION OFFICER:  We wouldn't be able to monitor the landline specifically.  We could reach out to the phone company and request records.  We could have him potentially sign a release of information so that there's no hiccup with the company.  We could do the same thing with a cell phone.  So it just depends.

MS. PECK:  I mean, if there's no difference as far as their ability to monitor a landline as opposed to a flip phone, I don't have a problem with him having the flip phone as long as it is something that will be randomly checked and, you know, checks can be put into place to ensure that he's abiding by the Court's conditions.

THE COURT:  Okay.  Given the government's position, I will change that condition to allow access to

a flip phone. But I'm going to require that the flip phone be maintained in the possession of one of his parents so that he would have to ask to use it and return it to their custody at the end of the phone call.

MS. NEAR: That's -- no objection.

THE COURT: Okay. I don't want him, you know, having access to it basically unsupervised. And then this will also give him the ability to speak with his lawyer privately and to ask questions and, although the content of any communications can't be monitored by probation, all things considered, it's a necessary feature to communicate and facilitate attorney/client communication. And if we have the added condition that it must be maintained by his custodians, assuming they're okay with that once they get here, that will be an adequate safeguard there.

The other thing I wanted to mention was I slightly modified the condition about family members being able to bring electronic devices into the home. I know my written ruling had mentioned Mr. Schwab's mother's, I think, comment on the record the day where she said she would frisk anyone who was coming into the house. These conditions are meant to constrict Mr. Schwab, but they also -- I'm mindful that they shouldn't unfairly constrict other people who aren't under the Court's conditions. So I've relaxed the conditions slightly to provide that

family members can bring the devices into the home, but they have to abide by the same conditions his parents do. They have to password- or biometrically protect those devices and not share the devices or passwords with Mr. Schwab.

I think I've also addressed the concern about contractors or workers coming into the home with the proposed conditions here. If there's any other comments on that, I'll hear from the parties.

MS. NEAR: Just briefly, Your Honor. I talked to Officer Wentz about the contractor workers. My understanding is that the Schwabs would just be required to say, we have a plumber at the house today. That there would be no additional background -- I don't want to invade the rights of anybody who's just showing up to do a job at the house.

THE COURT: Right, exactly.

MS. NEAR: Okay.

THE COURT: It's meant to be advanced notice. But there's only so far that we can go, again, to balance the rights of, you know, people other than Mr. Schwab here.

So it's meant to just give probation notice that those folks will be in the house, and then ensure that Mr. Schwab himself isn't asking to borrow their phone or

otherwise having unsupervised contact with them.

MS. NEAR:  Sure.  I don't know if it would be possible to specify specifically, since he's going to be supervised by a different district, specify what that notice has to consist of.  You know, are they -- because I don't want to get in a situation where somebody in Georgia is saying, I need names and dates of birth of everybody who's coming to the house or can you say the plumber is coming.  So I think the extent to which -- I was telling Officer Wentz, incidentally, I have another client being supervised in Georgia right now.  And I think --

THE COURT:  At the Gainesville office as well?

MS. NEAR:  I think by the Atlanta office.  But there's been a few disconnects between the two orders that I've had to quickly fix.  And so I think the more specifics in place, the less issues arise.

THE COURT:  Okay.  Officer Wentz, do you have a sense of what type of advanced notice should be provided to your colleagues in Georgia?

THE PROBATION OFFICER:  I think at least a text message would be sufficient.

THE COURT:  Okay.

THE PROBATION OFFICER:  And then just stating what capacity the individual is coming to the home.  So if it's a plumber, if it's an electrician, and then on what

day and time they're expected to be there.

MS. PECK:  I would note, though, Your Honor, I would ask that the names of those people be provided and not just the plumber or the electrician.  I mean, I do think we need to make sure that the people who are coming are who they say they are.

MS. NEAR:  Your Honor, I have real concerns about people -- let me think of how to say this.

I don't want to compromise the privacy rights. I don't want to compromise the immigration status.  I don't want to compromise anything about anybody who's just coming to cut the lawn or to address something at the house.

THE COURT:  How about this.  How about we ask -- how about they're required to provide the name of a company that is sending a worker?

MS. NEAR:  That's fine, Your Honor.

THE COURT:  And then from there, if there's an issue, we can always follow up with the company about who they sent in particular on a particular day.

MS. PECK:  Thank you, Your Honor.  I think that's fine.

THE COURT:  Okay.  All right.  Mr. and Mrs. Schwab, welcome.  I understand your flight was a little bit delayed.  So what we've been talking about thus

far is the release of your son to your custody under a number of proposed conditions.  I had sent a draft of the proposed conditions to the attorneys this morning, and we're modifying a few of them.

MS. NEAR:  Your Honor, I have a copy for each of them.

THE COURT:  Okay.  Thank you for being prepared in that way, Attorney Near.

So I understand that you've taken certain steps in advance of this hearing, including sending the $25,000 to the Court to be held in the Court's custody as well as executing all of the required paperwork for the bond to be secured by your two residences.

Let me just confirm, Attorney Peck, that the U.S. Attorney's Office has reviewed that paperwork and it appears to be fully in order.

MS. PECK:  The FLU unit of our office has reviewed it, Your Honor, and I am told that they are satisfied.  I have documents to deliver to them, but I think that they've already looked through them and made whatever recommendations or requirements as they saw fit.

THE COURT:  Okay.  And, Attorney Near, anything on that point?

MS. NEAR:  Yes.  I understand that Attorney Sciarrino reviewed everything, confirmed everything was in

place.  And I did deliver the original documents to Attorney Peck this morning for her to pass on to Attorney Sciarrino.

THE COURT:  Okay.  All right.  So I appreciate your taking those steps, Mr. and Mrs. Schwab.

The conditions that I'm proposing to release your son to your custody on are as follows.  Actually, before we go through that, let me ask the parties if there's anything else on the proposed conditions they want to be heard on.

MS. NEAR:  Just one other issue, Your Honor.  I saw that the -- in terms of restricting visitors, it was family members including extended family.  I thought that there was a -- well, let me take this in two pieces.

One, I wanted to be clear on the -- what constitutes "extended family."  So Mr. Schwab has three brothers, all three of whom have significant others who they've been in relationships with for over three years. So they've been part of the family.  And the question is could those individuals -- these are not people that they just met or just started dating; these are people who are well known to the Schwabs -- would that be permitted to be included in extended family, just those three significant others?  They're not married, I assume that's a "yet," given the extent of the relationship.  But that -- the

logistical complications if they visited and only one could come to the house and one had to get a hotel, I just wanted to know if they could be included in extended family.

THE COURT:  Any objection, Attorney Peck, subject to their being subject to the same conditions?

MS. PECK:  No, Your Honor.

THE COURT:  Okay.  They'll be able to be included.  What I had intended to mean by "extended family" was beyond immediate family.  So immediate family would be obviously his parents, his siblings, and then I was intending to capture I think an aunt was mentioned who might live close and be a frequent visitor in extended family.

Is there anybody else -- and I think we want to make these as specific as we can to assist Georgia in supervision.

MS. NEAR:  Correct, yeah.  His grandparents, I believe, are in Georgia.  So I assume that included extended family.  Your Honor had said something at one of the hearings about allowing the Adult Schwabs' friends to visit.  You know, if that's not something permitted -- and perhaps -- I'm just -- I feel a little badly depriving them of their entire social life for the remainder of the summer.  I don't know if there's a way for us to

confirm -- I have less concerns about maybe providing names of those individuals to probation if -- you know, maybe in advance to kind of say is there any issue or to -- so I'm just trying to figure out if there's a way to kind of carve that out for them.

THE COURT:  Let's take this in small steps.

MS. NEAR:  Okay.

THE COURT:  Let's start with the conditions as proposed, which would not include non-family visitors to the home.

MS. NEAR:  Okay.

THE COURT:  And if things go well for a period of time and Mr. Schwab is in full compliance and there are no reported issues, I will entertain a motion to modify the conditions.

MS. NEAR:  Okay.

THE COURT:  I need that to be at least a month.

MS. NEAR:  Okay.

THE COURT:  So I know that does take us through the end of the summer social season, but that has to be a sacrifice the parents are willing to make in this instance in order to really ensure that -- in that first period of time when the risk is the greatest of mistakes with the conditions that we constrain Mr. Schwab's activity as much as possible.

MS. NEAR:  May I just check with the Schwabs to make sure there's nobody else who's kind of top of mind for them?

(Brief pause.)

MS. NEAR:  Mrs. Schwab is inquiring about her brother-in-law, but I understand that he would be -- fall under extended family.  And if the -- and then the brother's significant other would also fall under the umbrella of extended family.

THE COURT:  Yes.  That's my understanding as well.  We can make that explicit -- when we say -- maybe I'll separate that condition into immediate family members including significant others of immediate family members and extended family members including significant others of extended family members.

MS. NEAR:  Perfect.  Thank you, Your Honor.

THE COURT:  And to be as broad as possible.

All right.  Anything else on the proposed conditions?

MS. NEAR:  I think that's it, Your Honor.

THE COURT:  Okay.  So back to addressing Mr. and Mrs. Schwab.

I'm sure you've read the ruling in this case.  This was a very close question for the Court.  There are factors weighing on both sides.  But, ultimately, I have

decided that the conditions proposed are sufficient to reasonably assure Mr. Schwab's presence at future court proceedings and the safety of the community. But, as I said in the ruling, in large part that depends on your roles as third party custodians to ensure that he doesn't violate any of these conditions of release. And the way that I will help to monitor the conditions of release is by the promise that you have made to report any violations.

Now, obviously the probation office will also be supervising him, and they may discover a violation that you don't discover. That becomes a problem for you because the conditions of release explicitly provide that if he is to violate any condition of release, the $25,000 can be forfeited and the homes that you've pledged as collateral for this release can also be forfeited. So it is in your interest to fully ensure that he is complying with his conditions of release. If we get word of a telephone, a cellular phone being found in the house on an unannounced visit by the probation office that you didn't know about, that is a big problem. So you need to be especially aware of what these conditions are and of your promise to help be the eyes and ears of the Court because you have a personal stake in this as well. Obviously, you don't want your son to return to custody, but you also

have your own personal stake by pledging your homes and the cash as collateral for the bond here.

So I'm going to be requiring the following conditions in the order of release:  First, Mr. Schwab must not violate any federal, state, or local law while on release; second, he must cooperate in the collection of a DNA sample if authorized by federal statute; third, he must advise the Court or the pretrial services office or supervising officer in writing before making any change of residence or telephone number; fourth, Mr. Schwab must appear in court as required, and if convicted must surrender as directed to serve a sentence that the Court may impose.

As of right now, the only -- the next court appearances are jury selection, which I believe is in June of 2026.  There may be a reason for a hearing before then, which I'll address in a moment, but I haven't put any specific date and time to appear here; I've just written in that he must appear as directed by the Court.

Fifth, he must sign an appearance bond if ordered, and I'm going to require him to sign an appearance bond in the amount of $1.5 million to be cosigned by his parents, Kevin Schwab and Laura Schwab, to be secured by real estate owned by his parents.  And in the public version of this document when it gets docketed

your addresses will not be listed, but they will be listed in a sealed version that will stay within the court system as well as $25,000 deposited with the Court.  The bond and collateral are subject to forfeiture if Mr. Schwab violates any condition of release.  So read the conditions of release very carefully so that you know what you're enforcing.

Six, Mr. Schwab will be placed in the custody of Kevin Schwab and Laura Schwab and shall reside with them; seven, he must submit to supervision by and report for supervision to the U.S. Probation and Pretrial Services Office.  And that, I understand, will be the one in Gainesville, Georgia, closest to your residence.

He must surrender any passport, which he has already done -- as I understand, the passport is in the possession of the FBI -- and not obtain another passport or international travel document.

He must abide by the following restrictions on personal association, residence, or travel.  Travel is restricted to Georgia and to Connecticut, and Connecticut only for the purposes of court appearances and attorney visits.

He must avoid all contact directly or indirectly with any person who is or may be a victim or a witness in the investigation or prosecution.  And the government has

provided a specific list of people to Attorney Near and to Mr. Schwab with a list of names. Those are the people with whom Mr. Schwab cannot have direct or indirect contact. So that means he can't call them directly and he can't call someone else and ask to have a message passed on to one of these people.

There was discussion before you arrived about the inclusion of Ms. Shae Waits, Mr. Schwab's girlfriend, on this list. At this time, I'm including Ms. Waits on this list, but I've required the government to produce to defense counsel by Thursday at noon the documents supporting its inclusion of Ms. Waits on the list. As Attorney Near said, she hasn't received those yet. And after Attorney Near receives those, to the extent that she wishes to make a motion to modify the conditions to allow for communication with Ms. Waits in some limited fashion, I'll take up that motion when it's filed.

Next, Mr. Schwab can get medical or psychiatric treatment as deemed necessary by the U.S. Probation and Pretrial Services Office. He must not possess a firearm, destructive device, or other weapon. He must not use alcohol excessively, he must not use or unlawfully possess a narcotic drug or other controlled substance unless prescribed by a licensed medical practitioner.

Here, I will say marijuana, despite being

legalized in many states, is illegal federally and so even if prescribed by a licensed medical practitioner. That would be something you would need to discuss with the probation office if that becomes a recommended treatment for any medical condition so that it can be dealt with. But I'm very unlikely to allow the use of marijuana, even for medicinal purposes.

Mr. Schwab must also submit to testing for a prohibitive substance if required by the probation office, and testing may be used with random frequency and may require urine testing, wearing a sweat patch, submitting to a Breathalyzer, and/or any other form of testing.

Mr. Schwab must not obstruct, attempt to obstruct, or tamper with the efficiency or accuracy of substance abuse screening of prohibitive substances.

Next, Mr. Schwab must participate in the location-monitoring program and comply with the requirements as directed in condition 7Q3, which is home incarceration.

So Mr. Schwab is restricted to 24-hour-a-day lockdown at his residence, except for medical necessities and court appearances or activities specifically approved by the Court. And at this time, there are none. So it is 24-hour-a-day, within the home, except for medical necessity.

He must submit to location-monitoring technology as directed by the pretrial services or supervising officer. And I understand that following this hearing, the GPS bracelet will be installed for Mr. Schwab, so he should meet with probation after this hearing to get that done.

He must pay all or a part of the costs of the location-monitoring service, including equipment loss or damage, based upon his ability to pay as determined by the pretrial services officer or supervising officer. He must report as soon as possible to the pretrial services or supervising officer every contact with law enforcement personnel, including arrests, questioning, or traffic stops.

And there are a number of additional conditions I'm adding to section 7S. First, he shall not have access to any electronic device capable of accessing the internet, to include cellular phones and tablets, with the exception that he may watch television on a smart television, provided that he is supervised while doing so and does not use it to access the internet.

This is a change from Judge Vatti's condition which had not included supervision. But because smart televisions can access the internet, I believe it's appropriate to add a supervision condition there.

Now, I had proposed that Mr. Schwab not have access to a flip phone, but I've been convinced based on arguments before you arrived, Mr. and Mrs. Schwab, that a flip phone will enable Mr. Schwab to reach out to Attorney Near to ask questions and will otherwise facilitate attorney/client communication.  Therefore, I will allow Mr. Schwab to have access to a flip phone, provided that the device is not capable of accessing the internet and provided that the flip phone stay in your custody, Mr. and Mrs. Schwab, unless and until Mr. Schwab needs to make a phone call.  And, therefore, you would be able to inquire about who he's speaking with, and after the phone call he is to return it to your custody.

MS. NEAR:  Your Honor, could I ask a question about that?

THE COURT:  Sure.

MS. NEAR:  Would the probation office or the pretrial services office have the number, the account, of that flip phone?

THE COURT:  I will require that he provide -- once the flip phone is obtained by Mr. Schwab, he is to provide the phone number and the carrier information to the probation office.  He shall also execute any necessary authorizations so that the probation office can obtain the log information for that phone number from the relevant

phone company.

THE PROBATION OFFICER:  Does the Court have an opinion regarding text messages from the flip phone?

THE COURT:  Attorney Near, let me hear your perspective.  Thanks for raising the issue.

If there are text messages to be -- basically, the reason for providing this phone is so that he can communicate with you.  If it's easier for you to receive text messages, I can authorize text messages to you.

MS. NEAR:  I think that's fine.  I think sometimes that's the only way you can reach me, between court appearances and -- so I would -- and obviously those are not communications we would want reviewed by probation.

So, yes, if you could authorize to any part of his legal team.  So, you know, Attorney Cristalli, Attorney Kaas-Mansfield in my office, if there's an investigator.  But nobody outside the defense team.

THE COURT:  Okay.  Any objection from the government?

MS. PECK:  Not to the defense team, Your Honor.

THE PROBATION OFFICER:  We would just need the cell phone numbers of the defense team.  Not for the content of the messages, but if we do review the logs, we would want to see that only your numbers were showing up.

MS. PECK:  Sure.  We can provide those.

THE COURT:  Okay.  So Mr. Schwab will be permitted to use the flip phone for phone calls to his attorney, any of his attorneys or defense team, and for text messages to any of his attorneys or members of his defense team.

The phone numbers of the members of the defense team shall be provided to the probation office so that they may verify that those are the phone numbers he is calling.

MS. NEAR:  And, Your Honor, just to clarify so everybody is certain, in terms of what he's permitted to use that phone for now, is he permitted to call his brother or is he permitted to call -- or is it only for legal use?  I just want him to be clear on the parameters for the use of the phone.

THE COURT:  What's the government's position?

MS. PECK:  I mean, I think, Your Honor, if the point of this was to give him access to his legal team that that's what the phone should be for.

THE COURT:  I tend to agree.  We are really trying to limit Mr. Schwab's communication with other people.  So the flip phone is an accommodation so he can contact his attorneys and his defense team.  So the flip phone is intended for that purpose only.

Again, after a track record of compliance, perhaps there's a possibility of expanding that use beyond -- I don't think it would be to, you know, the general public.  But if we wanted to expand it to other people on whom he relies for emotional support such as family members, then we can consider that.  But for now, the flip phone is to be used solely for the purpose of contacting a member of his defense team either via phone or text message.

MS. NEAR:  And so -- and just to kind of play this out again just so the Schwabs -- everybody is on the same page, if he did want to call his brother, he could call on speakerphone with his parents, using one of their phones?

THE COURT:  Correct.

MS. NEAR:  Thank you, Your Honor.

THE COURT:  So long as the passwords were not shared with him and he's not able to access the internet.  But those are not attorney/client privileged communications, so they can occur in the presence of his parents on their phones.

MS. PECK:  Okay.  Thank you, Your Honor.

THE COURT:  All right.  Additional condition number 2, the third party custodians', meaning Mr. and Mrs. Schwab's, personal electronic devices, including but

not limited to cellular phones, tablets, and laptops shall be password- or biometrically protected from any access by Mr. Schwab, and the passwords shall not be shared with Mr. Schwab.

Additional condition number 3, at least one of the custodians must be present in the home at all times to supervise Mr. Schwab.

Number 4, the United States Probation Office shall designate Mr. Schwab as high risk so that any attempt to remove the location-monitoring device, leave the state of Georgia, except as permitted in this order to travel to Connecticut for court appearances and attorney visits triggers an immediate alert.  Exclusion zones shall be placed around any airports within 100 miles of Mr. Schwab's proposed residence.

Five, immediate family members and significant others of immediate family members and extended family members and significant others of extended family members are permitted to visit the proposed residence.  Any such family members must password- or biometrically protect any electronic devices they bring into the home during their visits and shall not provide Mr. Schwab with access to such electronic devices or their associated passwords.

Mr. and Mrs. Schwab, this is a slight modification to what we had discussed at the prior

hearing. Mrs. Schwab, I remember you had volunteered to frisk anyone and to make sure they didn't bring any devices into your home. I've relaxed that condition somewhat so that these family members are subject to the same conditions you are subject to. They can bring those devices into the home, but they need to be password-protected and they cannot be provided to your son. This enables them to have slightly more freedom on their visits. And, as I mentioned to your son and to the parties here, these conditions are meant to constrict and limit your son's activities, but not overly constrict or restrict the activities of others with whom you interact, including family members of your son.

With respect to contractors and workers to your home, they are permitted to visit the residence with advanced notice via text message, at a minimum, or a phone call to the U.S. Probation Office and Pretrial Services Office. The text message must state the company that is coming, the day and time that the company is expected to be at the home, and the type of work that the company does -- meaning it's a plumber, electrician, lawn-mowing service, et cetera.

Importantly, this condition is advanced notice, not advanced permission. So you don't need to, for instance, hear back from the probation office saying, yes,

it's okay that this person comes. It simply means that you must provide advanced notice, ideally a day or so in advance if you can. But if it's an urgent situation where you need a plumber in an hour, give them an hour's notice.

Contractors and -- so Mr. Schwab is not permitted to communicate with any contractors or workers alone without any supervision. And contractors and workers shall not provide Mr. Schwab with access to any of their electronic devices.

Next, Mr. Schwab shall not be permitted to mail any letters through the U.S. Postal Service or other mailing service, except to his attorneys or to the Court as necessary. Next, Mr. Schwab must be transported from court here in Connecticut directly back to Georgia in his parents' custody.

And I understand that's the arrangement that's been made, Attorney Near; is that correct?

MS. NEAR: That's correct, Your Honor. They have a flight early this evening that I understand is direct to Atlanta. The Schwabs have indicated that they need to pick up something at the Atlanta home. Mr. Schwab would not get out of the car. It would involve Mr. Schwab running into the house and running back out, and then they would make their way back directly to the residence where they will stay.

THE COURT:  And what is the proposal for first meeting with the probation office in Gainesville?

MS. NEAR:  I believe Officer Wentz told me that they're coming to the house tomorrow morning.

THE PROBATION OFFICER:  Correct.

THE COURT:  All right.  That works.

All right.  Next, should additional hearings be required in this matter prior to trial, Mr. Schwab will be required to appear in person in Connecticut and at least one of his custodians will be required to travel with him for any court appearances in order to continually monitor his compliance with his conditions of release.

I'm going to be adding a condition that's not in the proposal here, which is that with prior permission -- again, permission, not notice -- but with prior permission of the U.S. Probation Office, Mr. Schwab may travel to Atlanta for meetings in his attorneys' office through Zoom with his defense team, provided that he is at all times during the transportation supervised by a custodian and during the Zoom meetings he has no access to an electronic device without supervision of some member of the defense team -- which means, Mr. Schwab, in those meetings a paralegal or someone will need to be sitting there with you for the entire meeting.  But those people would fall under the attorney/client privilege so you could still

communicate effectively with your attorneys in that setting.

All right.  Have I missed anything we've been talking about?

MS. NEAR:  Your Honor, the -- I don't --

THE COURT:  Go ahead.

MS. NEAR:  The only thing that Mr. Schwab brought to my attention -- and I don't know if this is best assessed after probation sees the property tomorrow -- is I believe -- and the Schwabs can correct me if I'm wrong -- there are two buildings next to each other, so just understanding the zone for the home incarceration.  Is he permitted to go outside into the other building?  Is he allowed to go into the yard?  I don't know if that's something best assessed by probation tomorrow with a report back.  But that would be my only kind of question so he knows, can I go in the backyard, can I go on the back porch?  I just want to make sure he's clear on what the parameters are.

THE COURT:  Let me hear probation's perspective.

THE PROBATION OFFICER:  We surely will leave it up to the Court.  Our opinion is that given these conditions, he would be restricted to the inside of his house.  But if the Court has a different opinion, then obviously we would abide by that.

THE COURT:  Is there -- is there a back porch? I mean, I don't mean to not, you know, allow you to see the sky, Mr. Schwab.  If there's an area of the home where he could be outside, but still be within the parameter of the home, that would be ideal.

MS. NEAR:  I understand that there's a deck connected to the home, Your Honor, that he could -- and it's covered, but attached to the house.  And so that --

THE COURT:  Okay.

MS. NEAR:  If he's able to go out on the deck, that would be -- yes.

THE COURT:  That would be permissible.  You're able to go out on the back deck.  I don't quite understand what you mean by two buildings connected to each other, though.

MRS. SCHWAB:  May I talk?

THE COURT:  Sure.

MRS. SCHWAB:  There's a garage with a room above it that we're constructing right now.  It's attached by a staircase.  It's all attached.

THE COURT:  Okay.

MRS. SCHWAB:  But I was -- and maybe this is in the future.  But I was really hoping he would be able to go out in the yard because I wanted him doing my yardwork.

THE COURT:  So taking the issue of the room

above the attached garage, that's permissible since it's part of the same property. The -- I understand there's obviously a human need for, you know, seeing the sun and seeing the sky.

Let's do this. Let's sort of revert to my statement earlier, which is that for the first month or so I want these to be very restrictive conditions until we get a sense of compliance. And then if things have gone well after that period of at least one month, then I'll consider revisiting and expanding the conditions ever so slightly. I mean, there will never be a situation in which Mr. Schwab is free to take his car out and run errands. That's not going to be happening. But we can gradually expand the conditions to include greater amounts of freedom if there is a showing of full compliance with these conditions over time.

All right. Anything further, Attorney Near?

MS. NEAR: No, Your Honor, thank you.

THE COURT: Attorney Peck?

MS. PECK: No, Your Honor, thank you.

THE COURT: Okay. Okay. So what I'm going to do, given that we've made a few modifications to these conditions on the record, I just want to review myself with -- my courtroom deputy has been trying to take everything down that I've been saying, but I want to

review myself the revisions. If all looks fine, I will give her the go-ahead from my chambers and send a printed version up here for the parties to review and sign.

And, Mr. Schwab, as I've said several times now, this is a very close case. And so any blip of noncompliance will be taken very seriously. Although you're being supervised in Georgia, word will get from Georgia to Connecticut very quickly and I will be scheduling a hearing as soon as possible if I hear of, again, any blip of noncompliance.

Keep in mind, your parents are really putting themselves out on a limb for you here. They're putting their homes at risk, the roof over their heads. And so not only do you have an obligation to comply with the Court's conditions because I'm setting them, but you have a personal obligation to them for the risk that they're taking in this matter.

And, again, if I hear of any noncompliance, I will take it very seriously and the likely consequence is going to be revocation of your release conditions, and you would end up back in custody until your trial date, which I'm sure you don't prefer.

So with that in mind, I will go ahead and review those conditions in writing, get the paperwork up to you as necessary.

Is there anything further from probation that I should address?

THE PROBATION OFFICER:  Nothing from probation.

THE COURT:  And from Mr. Schwab?

MS. NEAR:  No, Your Honor.

THE COURT:  And from the government?

MS. PECK:  No, Your Honor, thank you.

THE COURT:  All right.  So if all goes well, the next time I'll see you, Mr. Schwab, is in advance of your trial.  Of course, if there's a need for a hearing before then, I will make myself available.  Thank you.  The Court will stand in recess.

(In recess, 1:05 p.m.)

CERTIFICATE

RE: *US. v. JAMES SCHWAB*

Case No. 3:25-cr-00030-SVN-1

I, Cassie Zayas, RPR, Official Court Reporter for the United States District Court, District of Connecticut, do hereby certify that the foregoing 41 pages are a true and accurate transcription of my stenographic notes taken in the aforementioned matter to the best of my skill and ability.

_ /s/   CASSIE ZAYAS_____

Official Court Reporter
United States District Court
141 Church Street
New Haven, CT 06510