UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

```
------------------------------ x
                               :
  UNITED STATES OF AMERICA,    :
                  Plaintiff,   :        Criminal No.
                               :     3:25-CR-00030 (SVN-1)
            vs.                :
                               :        August 22, 2025
  JAMES SCHWAB,                :
                  Defendant.   :
                               :
------------------------------ x
                                    United States Courthouse
                                    915 Lafayette Boulevard
                                    Bridgeport, CT
```

BOND MOTION HEARING

(Transcription from Electronic Recording)

Held Before:

THE HON. S. DAVE VATTI
United States Magistrate Judge

Transcription Services of
FALZARANO COURT REPORTERS, LLC
4 Somerset Lane
Simsbury, CT  06070
860.651.0258
www.falzaranocourtreporters.com

APPEARANCES:

    <u>For the Plaintiff:</u>

        OFFICE OF THE UNITED STATES ATTORNEY
        1000 Lafayette Boulevard – 10th Floor
        Bridgeport, Connecticut 06511
        203-668-3905
        karen.peck@usdoj.gov.
            BY:  KAREN L. PECK, ESQ.
                Assistant U.S. Attorney

    <u>For the Defendant:</u>

        JACOBS & DOW
        350 Orange Street
        New Haven, Connecticut 06511
        201-772-3100
        anear@jacobslaw.com
            BY:  ALLISON MURRAY NEAR, ESQ.

        JACOBS & DOW
        350 Orange Street
        New Haven, Connecticut 06511
        201-772-3100
        ekaas@jacobslaw.com
            BY:  EMILY C. KAAS-MANSFIELD, ESQ.

        AGNIFILO INTRATER LLP
        140 Broadway – Suite 2450
        New York, New York 10005
        646-205-4350
        teny@agilawgroup.com
            BY:  TENY GERAGOS, ESQ.

        AGNIFILO INTRATER LLP
        445 Park Avenue – 7th Floor
        New York, New York 10022
        646-205-4350
        marc@agilawgroup.com
            BY:  MARC AGNIFILO, ESQ.

(Proceedings commenced at 2:11 p.m.)

THE COURT:  We are here in the matters of United States vs. James Schwab, Docket Number 25-CR-30 SVN.

If I could have appearances starting with the Government please?

MS. PECK:  Yes, good afternoon, your Honor. Here for the Government is Karen Peck with the U.S. Attorney's Office.

THE COURT:  Good afternoon, Attorney Peck.

MS. NEAR:  Good afternoon, your Honor.  Allison Near for Mr. Schwab who is here with me at counsel table. Also we have Attorney Marc Agnifilo and Teny Geragos and Emily Kaas-Mansfield.  Our new counsels' appearances were filed this morning.

THE COURT:  Yes, I saw that on the docket.

So good afternoon to all of you.  Good afternoon, Mr. Schwab.

THE DEFENDANT:  Good afternoon, your Honor.

THE COURT:  All right.  So we're here with respect to ECF 91, motion to modify conditions of release that was filed on July 25, and then are also here on ECF 114, the supplemental motion to modify conditions which was filed I think last night.

So I thought it might be easiest to take up

the supplemental motion first and then we'll deal with ECF 91.

MS. NEAR:  Yes, your Honor.  I will say that I filed this yesterday morning and I apologize for filing it so late to the date of the hearing.  I spent a lot of time speaking with the Probation offices to get their input on what made the most sense and what they were comfortable with and I wanted to make sure I could represent everybody's position before filing.

THE COURT:  And I should note for the record that United States Probation Officer Kaitlyn Wentz is here in the courtroom with us seated in the jury box.

So go ahead, Attorney Near.

MS. NEAR:  Thank you, your Honor.

So at the date Mr. Schwab has been out on release now for over a month.  He has been fully compliant with what I think we would all agree are very stretched conditions of release.  I can represent that that the family and Mr. Schwab have reached out to me consistently if they have any doubt about any condition to ensure that they are on the side of right.  And so they have gone above and beyond, I think, to ensure that they have remained compliant with the Court's orders.

And one of the things Judge Nagala contemplated at the time of releasing him was some slight modifications

to his conditions after he had a period of compliance for at least 30 days. And specifically, you know, two of the issues that are raised in the supplemental motion are, one, just the ability to go outside to be in the yard. I think his parents were looking for his assistance with yard work. That was one of the issues. And the other was for his parents to have friends over at the house. My understanding is that both of those conditions, there's no objection from either Officer Wentz or Officer Heath, who is his supervising officer in the northern district of Georgia.

And of course any -- so in terms of going outside that could be accomplished just be enlarging the zone of restriction to include those outdoor spaces. That's what Officer Heath has advised me. And in terms of any friends of his parents they would be subject to the same restrictions on any of the visitors who are currently permitted to come to the house, which is that any device in their possession must be password protected or biometrically password protected. So those were two of the conditions.

And then one of the other --

THE COURT: I'm going to start with the yard.

MS. NEAR: Sure.

THE COURT: How big of a yard are we talking

about?

MS. NEAR:  I think the -- may I have one moment, your Honor?

THE COURT:  Yes.

MS. NEAR:  Less than an acre, your Honor.  And I do know Officer Heath has been out to the home several times and has seen these spaces and said that there is a dock in the back of the house, that there's a yard in the front of the house, and he had no concerns at all about that growing that zone for him to be able to move outside.

THE COURT:  I'm sorry, there's a dock in the back of the house?

MS. NEAR:  There's a dock.  It's on the water.

THE COURT:  Okay.  Is there a boat?

MS. NEAR:  There is a boat.

THE COURT:  Okay.

MS. NEAR:  It's a lake.  But I think that if there was concerns about the dock whether, you know, I think he could put the boundary so that he would not be able to go beyond the dock.  But whatever your Honor feels is appropriate.  I think that Officer Heath felt it would be beneficial for him if he could spend some time outside.

The other conditions that were not directly contemplated at the time of release, but there's no objection from either of the Probation officers, one

concerns his location restriction status and the other concerns who can stay with Mr. Schwab as somebody must be with him at all times.  So I will start with the latter first.

Presently Mr. and Mrs. Schwab cannot leave the house together for any purpose.  If they had to go to a medical appointment together, if they wanted to go to religious services together, they can't do anything.  So the proposal was that his two older siblings who I understand had been vetted by the Connecticut district office, I understand Officer Wentz has spoken with both of them, explained to them the obligations of a third-party custodian, that for limited periods of time one of them would be able to stay with Mr. Schwab so that Mr. and Mrs. Schwab would have the ability to leave the home.

This is not a permanent situation, this is not an extended situation.  It's just for periods of time where Mr. and Mrs. Schwab would like to or would need to go outside the home together.

Not only has Officer Wentz explained to them the obligations of what a third-party custodian would be in that if they saw Mr. Schwab do anything that was inconsistent with his conditions that they would have an obligation to immediately contact Probation.  Certainly his older siblings understand what is on the line should

he violate any of his conditions, particularly his family's two homes, and they have understood that they accepted that.  They accept and understand those obligations.

I can also represent that Mrs. Schwab has spoken to those older siblings.  Your Honor has had an opportunity to engage with Mr. and Mrs. Schwab, and I can assure you that whatever Officer Wentz advised about what those obligations would look like, Mrs. Schwab has probably passed on those obligations with even kind of a greater sense of urgency.  So that was one of the other proposed conditions.

The last one was we had a lot of back and forth with Officer Heath and Officer Wentz about ways to give Mr. Schwab very limited periods of time where he could go out of the house.  He'd get a haircut, he needs to go to the dentist, things that aren't medically urgent but things that he needs to do.  Attend religious services with his family, which is something that I believe Mrs. Schwab at one of the hearings was important.

And after some back and forth what was proposed is we asked the Court to modify the status to home detention with the understanding that he would only be allowed a 2-hour window of time out of the house a day. And that 2-hour window would be treated like any other

home detention timeframe. So he could get approval, put in a schedule as to where he would intend to go. He would be accompanied by at least one of his parents at all times. I would not ask for one of the siblings to be a custodian in that case, just one of his parents would have to be with him during that 2-hour window. And that Probation would have the discretion to approve the activities during that window on a daily basis. But doesn't mean he would use that window every day, but one of the ways they may use that time is just to take a walk around the block or take a walk through the neighborhood.

And again, Officer Heath and Officer Wentz thought that that this path forward was the best way of kind of allowing that opportunity for him to have some very limited supervised periods of time outside the home.

THE COURT: Okay.

MS. NEAR: That's all from me.

THE COURT: Okay. Attorney Peck?

MS. PECK: Yes, your Honor.

So as you know we obviously opposed him being released from bond.

THE COURT: Oh, I think I know that pretty well.

MS. PECK: You know that very well. We continue to have the same concerns we've had since this case began. And there were certain motivating factors that led to a

very detailed set of conditions that ultimately Judge Nagala imposed in this case, and the motivating factors for this were that this Defendant was supposed to be under the careful supervision of custodians who had a strong financial stake in his appearance and his compliance. That's his parents.

They were advised that this was going to be a very restrictive situation and that it was going to be restrictive on them as well as on him.  That was a month ago.  Without someone with the same level of responsibility and financial stake, in the Government's view this whole order is fundamentally changed.  We don't have much information about the siblings.  This was given to us.  My agents are out dealing with immigration and various other things, but I have no sense of that and simply having someone say we told them what the order says and what they have to do doesn't offer me anything to be honest with you.

THE COURT:  Is the sibling issue sort of substitute custodians on occasion your biggest objection?

MS. PECK:  No.

THE COURT:  Okay.

MS. PECK:  The order was also put into place so that the Probation Office the Court would have full knowledge about who is in the circle of people that this

Defendant is going to be around.  So the notion that random friends of the family would come in and that there would be a password on their phone and that's sufficient to restrict this Defendant, I don't think that's even close.

If you'll notice what Judge Nagala had in here it's -- there was a discussion about whether significant others of immediate family members could come, and that was then put in here specifically.  There was a discussion about what would happen if a contractor had to come to the house and that was put in here specifically.

So here we are a month later and it's like, well, the parents want to have friends over so as long as they have passwords on their phones they should be allowed in.  The circle was supposed to be tight.  The restrictions were supposed to be tight.  That's not tight.  And so that was one of the motivating factors for how this order of a month was crafted.

The order was also supposed to -- to the extent, the fullest extent possible -- ensure that the Defendant would have no ability to access electronics for the internet given his level of computer sophistication, given the years of cyber-related criminal conduct that there is evidence he committed given the very real possibility that he could access cryptocurrency wallets that are not in law

enforcement, possession of which we have reason to believe there are several. That was another reason to restrict the persons who would come into contact with him. And --

THE COURT: Well, let's just suppose that the parents have a group of six friends that from time to time they like to have over for dinner. What is the danger to the community from having, let's say, a neighbor over for dinner?

MS. PECK: I guess it depends on is that neighbor going to bring his cellphone with him?

THE COURT: Well, let's supposed the neighbor like most people do these days is going to have a cellphone in their pocket, what is the danger to the community that Mr. Schwab is going to get his hands on that cellphone during dinner and do something?

MS. PECK: Maybe.

THE COURT: Okay.

MS. PECK: I think the reality is in July we have this order that's got 10 specific and very, you know, thorough conditions that were imposed, and as far as modifications there's only one place where there's a discussion of modifications and it's on the 10th one. It says access to outdoor spaces on the property will be considered after at least a one-month track record of compliance is established. That isn't said anywhere else.

So all of the other 9 where we have all of this stuff, there was a suggestion that in a month, you know, we can do away with this.  In my view one month is not an established track record.

I'm not going to object if there is a desire for him to do yard work in his yard and help his family out and be outside in that respect.  If the Court sees fit to do that I'm not going to object to that.

THE COURT:  Yeah, that was probably the least objectionable --

MS. PECK:  It is the least objectionable.

THE COURT:  -- that he can have access to the outdoor spaces to his yard.

MS. PECK:  Absolutely.

THE COURT:  As long a the parents, I assume, are the owners of the boat and have the keys and the keys are locked away.

MS. PECK:  And I'm not going to object to that, your Honor.

THE COURT:  Okay.

MS. PECK:  I have no problem with him going out in the yard, especially if it's going to help his parents out with maintaining a yard to the extent that he can do some productive work at the house.

THE COURT:  What if the visitors to the home

that the parents want to have over for dinner and don't bring their cellphones?  Does that change your position?

MS. PECK:  Yeah.

THE COURT:  Is that a problem?

MS. NEAR:  Your Honor, you may recall, I can't remember which hearing it was in, Ms. Schwab actually said that one of the things she might impose is asking people to turn over their cellphones at the door.  I don't know if it's realistic to tell people you are not allowed to have a cellphone at all, but to say you leave it into your car, you can't bring it into the house, I don't think that is objectionable.

MS. PECK:  Yeah, I don't we should be in this case after one month widening the circle of people that this Defendant has access to.  If they are going to bring any electronics in, if there's not going to be any way that he could get access to something like that, okay.  But you know, there were restrictions put into place for a reason.

THE COURT:  No, I understand that but -- and I also understand the language of the order, but also Judge Nagala didn't say that there's going to be no consideration of modifications as we go along.  I think they made a request of --

MS. PECK:  We're a month in.

THE COURT:  I understand that.  They've made a request for modifications.  I'm trying to understand the scope of the request and the scope of the objections and what the basis for the objections are.

MS. PECK:  I understand.

THE COURT:  So I don't have any issue with Mr. Schwab having access to the outdoor spaces in his yard with the protection of the boat.  I don't have any problem with -- let me get an understanding of who are the visitors the parents want to have to the home?  Is this a circle of friends, is this neighbors, is this limited to a small group of individuals?  If you could give me some sense of that.

MS. NEAR:  That is my understanding, your Honor, is that -- and Mr. Schwab is here and can confirm that that's the case, but this is not -- they are not looking to invite, have a big bash and invite 50 people over. These are close friends, these are neighbors, these are people that are kind of part -- are family in ways.  But it just gives them an outlet to have time with the people that they're close to beyond their immediate family.

I will also note that we are not in a universe where there are no electronic devices in the home right now.  I mean the family has electronic devices.  If family, the siblings and their significant others come

over, they have electronic devices.  There is a court order that those must be password protected.  So I don't thing there's any issue if these other individuals needed to leave a phone in the car or, you know, needed to -- but as a practical matter if what the Court is concerned of is that there could be some universe where Mr. Schwab gets his hands on some electronic device that's password protected, that already exists.  So I don't see how keeping other people who are subject to that same restriction and a failure to follow that restriction will constitute a violation of the conditions of release is problematic.  Again, we're not talking about a crowd where the kind of party that Mr. Schwab can get lost in the crowd or could, you know -- we're talking about a close circle of friends.

I think as a practical matter, your Honor, even if you wanted to put -- and I haven't discussed this with Mr. Schwab or the Schwabs, if you wanted to put a limit on the number of friends who would come at a given time --

THE COURT:  That's what I was just thinking.

MS. NEAR:  -- I don't think that would be a problem.

THE COURT:  Attorney Near makes a good point that there are electronic devices in the home that would be far more likely that Mr. Schwab could access

nefariously if he wanted to as opposed to, you know, a neighbor coming over for dinner and having a phone in their pocket.  It just --

MS. PECK:  Yeah, except for his bond requires that if there's any violation of any condition of this release the bond is forfeited.

THE COURT:  Um-hum.

MS. PECK:  And so if you're a parent and it's your house on the line, that's a little different than if your some random friend.  I mean this is any condition of this release and 1.5 million dollars in houses can come to the Government and Chris Serino (phonetic) will do that.

THE COURT:  Wouldn't that also apply if Mr. Schwab were to grab somebody else's phone like a neighbor who comes over for dinner?

MS. PECK:  Well, it would apply to him but a neighbor doesn't have the same sort of stake in worrying about that.

THE COURT:  No, but Mr. and Mrs. Schwab would still be on the hood under the bond conditions.

MS. PECK:  They'd be on the hook, but again are they, you know, are they going to be responsible for their neighbor's -- access to the neighbor's phone.  If somebody is going to come over and there's a finite number of people and they're going to keep their phones in their

car, fine.  But I don't think there should be other electronic devices in the house.  I mean that was sort of one of the major factors in this bond in the first place.

THE COURT:  All right.  What else are you objecting to?

MS. PECK:  I'm objecting at this point to home incarceration being changed to home detention after one month.  If there are places that Mr. Schwab needs to go I think that having the Probation Office alerted and give approval beforehand is one thing.  I think having a two-hour window every day for him to go out, that's not home incarceration, and that is what was ordered four weeks ago.  So, you know, if he needs to go to a doctor's office, if he needs to go to a dentist or whatever the things that they were discussing, that's something that the Probation Office can be alerted to and can approve ahead of time so they're aware where he's going to be.  But two-hour window every day for him to go out as he sees fit, I don't understand why that's even being considered at this point.

THE COURT:  Okay.  Anything --

MS. NEAR:  If I could say one additional thing.

THE COURT:  Were you finished with your list of objections?

MS. PECK:  I'm not sure --

THE COURT:  Is there anything else that --

MS. PECK:  Have I not addressed --

THE COURT:  I think you covered them all but I'll go back to you if something pops up.  Go ahead, Attorney Near.

MS. NEAR:  I just want to respond directly to that.  I had originally talked to Probation about leaving it at home incarceration and creating this two-hour window, and that was the conversation we initially had, is leaving it that way.  And my understanding, and Officer Wentz can weigh in, is that when she conferred with her office it made more sense to make it a very limited home confinement because I think the nature of home incarceration, just how it's defined in the conditions of release, is very limiting on its face.

And so it wouldn't even kind of -- what Attorney Peck has proposed, that it would have to be approved by, you know, if there are limited things that he wants to do that would have to be approved by Probation, that is home confinement.  Because home incarceration keeps him at the home essentially for -- with the exception of emergencies, emergency medical issues, court appearances or meetings with counsel.

So I had originally thought that was the easier way to do it but at least Connecticut Probation felt like

the better way, just because of how it's written in the conditions of release, was to make it a very strict home confinement.

THE COURT: Yes.

MS. PECK: I don't think two hours a day is a strict home confinement. I mean it does say medical necessity, so one could argue that that's what it is. But if the request is that he needs to be able to go to certain places and as read he doesn't think home incarceration allows it, then that should be what's the modification. If you need to go to the doctor, you get the approval of the Probation Office and they will --

THE COURT: Well, things like dental appointments, doctor's appointments, haircut, those are all things that you need to make appointments in advance. It strikes me that those type of things, if there's an appointment, you can definitely reach out to the Northern District of Georgia Probation Officer and ask for permission, here's where I'm going, here's the date and time, can I have permission to do that. That avenue is already there. I would permit that.

With respect to two hours a day out of the home, what is your argument as to why that's a danger to the community at this point? Let's suppose it was an hour and he's able to go for -- and it's a set time every day, he's

able to go for a walk down the street with his parents, in the presence of the third-party custodian. So what's the danger?

MS. PECK: Well, I mean I guess part of it is the location monitoring, there was like areas he was restricted from going at all. There was ways in which he was supposed to be constantly monitored.

THE COURT: Yes.

MS. PECK: I guess if the question is, you know, is there going to be a set time when the Probation Office is aware that he's going to be away from the location where he is supposed to be, you know, if they want to do it that way, okay. But you know, I think it's got -- it needs to be set and restricted. I think that the whole notion was that his person's location needs to be monitored at all times because of the very real risks that he -- to flight and to danger generally, the community being (indiscernible) large given that the kind of crimes he was committing was victimizing people all over the world.

You know, I think that the notion was that his location needed to be restricted and monitored in real time by the Probation Office.

THE COURT: So if it was a set time each day would you object to the two-hour window?

MS. PECK:  If it was a set time each day he's with his parents at all times and the Probation Office is aware that that's the time that he can be out.

THE COURT:  This must be the civil mediator in me.  I'm trying to broker an agreement between the two of you.

MS. PECK:  I mean, look, your Honor, I think he's a risk.  I do and you know that.

THE COURT:  This is like a meet and confer.

MS. PECK:  Yeah, I mean you know that.  I mean I do think that this Defendant poses particular risks.  So I am going to argue that he needs to be as restricted as possible.

THE COURT:  I'm also trying to minimize the administrative burden on Probation for one case.

MS. PECK:  Correct.

THE COURT:  So I think, Officer Wentz, maybe you can tell us would it be problematic if it was just a general two-hour window and Mr. Schwab and his parents can just pick whenever that two hours is, would that create more of a burden as opposed to a set two-hour window each day?

OFFICER WENTZ:  So the way that I read this condition my understanding is that Mr. Schwab would report to the Probation Office the list of places that he's

looking to go each day and the two hours that he's looking to go, and then we would submit essentially a schedule for him to be allowed to leave the home to go specific places.

So to Attorney Peck's point he's not just getting two hours a day to just go wherever he pleases. It's just specific preapproved locations.

In terms of the time, if he can do the same time each day that would be certainly convenient for our office but it's not required.

THE COURT:  Okay.

MS. NEAR:  I have another thought, your Honor. I mean so I'm looking back at the home incarceration language and it says activities specially approved by the Court.  Because I know -- I'm just trying to think realistically and trying to avoid coming back for something minor like, oh, because they're in rural Georgia it turns out it takes two and a half hours for them to get back and forth to church.

There's a provision in the home incarceration that says or activities specifically approved by the court.  Is there avenue to give Probation the authority to approve those activities like on an individual basis?  So if he said -- and again, I don't know if that's a higher administrative burden than it would be is to say I want to go for a walk with my parents, I'll be back in, you know,

an hour, for Probation to say that's okay.

I mean I do know from Officer Heath he's watching him all the time. He gets regular reports about his whereabouts. And so Officer Heath I think from his perspective less administrative burden is better because he feels like he can see him all the time and so he's not as concerned about it. But I'm just wondering if there's a way to give him a little more discretion to make those calls.

The problem with home incarceration is activities specifically approved by the court contemplates that I would have to come back to the court for every single thing that he would want to do. And so I think that's why the Connecticut office thought home detention just didn't create that need to keep having to come back.

THE COURT: Where is the church located and what day do the Schwabs go to church?

MS. NEAR: My understanding is that it's Sunday morning and that was one of the ones that they were concerned about the two hours because the service is an hour and I think it takes an hour to get there each way. Is that correct?

THE DEFENDANT: It's about (indiscernible) minutes.

MS. NEAR: It's not 30 minutes. Okay. So if

that's right --

THE COURT:  It's 30 minutes to the church and then 30 minutes back home?

MS. NEAR:  Yes.  That was the concern is it was just right at the two hours and so that was kind of the day that it would be maybe two and a half hours to make sure that they don't have any issues.  They don't have the traffic problems, rural Georgia is just questionable getting there and back.

So again I don't know -- I don't want to create a burden, a higher burden than is necessary for Probation. I don't want to create a burden for the court to have to keep saying, oh, now he needs to -- can he go and do this. And so home detention it seemed to me was the best way to kind of give Probation the ability to make that call on a regular basis while also keeping a very tight constraint about where he could go, how long he can be gone and kind of making sure that Probation is always aware of where he intends to go.

THE COURT:  All right.  Anything further?

MS. NEAR:  Not on that, your Honor.

THE COURT:  Okay.  I'm going to take a little bit of time to talk to Officer Wentz.  The one thing I'm not going to do in this case is I understand the burdens on Mr. and Mrs. Schwab at this point and I understand that

they can't go places together. But at this moment 30 days in I am not comfortable with the siblings supervising Mr. Schwab in the absence of his parents if they're out of the home together.

I think the parental dynamic versus a sibling dynamic is just very different when it comes to supervision, particularly one of the siblings is 25. I just don't think that's something I'm comfortable with at this point. Maybe as time goes on and there's a longer and longer track record of compliance the 33-year-old might be potentially a custodian, but I think we're still a ways away from that. So I'm not going to do that change right now.

But I think the rest of the requests, let me discuss with Officer Wentz and I think we can figure something out here, okay?

COURTROOM DEPUTY: The Honorable United States District Court for the District of Connecticut is now in recess.

(Recess.)

THE COURT: I am going to grant the supplemental motion to modify conditions of release in part and deny in part. The part that is denied is the portion that I already expressed which is any supervision by Mr. Schwab's siblings and appointing them as third-party custodians to

permit the parents to leave the house together.  That portion of the motion is denied.

I am going to grant the supplemental motion in the following respects.  Mr. Schwab will be permitted to utilize the outdoor spaces of his yard provided that he has no access to the boat or keys to the boat.

I'm also going to permit Mr. Schwab to attend any dental appointment, doctor appointment, religious services every Sunday and any other engagement that requires an advanced appointment as long as 48 hours advanced notice is provided to the Probation Office and he is accompanied by a parent to all of those types of engagements that I just listed.

I'm also going to permit Mr. Schwab to be outside the residence for one hour per day Monday through Saturday from 5:30 to 6:30 p.m.  I'm also going to permit the Schwab parents to have a maximum of four visitors to the house at any given time provided that those visitors shall be instructed to leave their electronic devices locked in their cars.

My overall comment about this is we are 30 days in and I appreciate that there's been a record of compliance.  I think this is an effort to go slowly without creating a chaotic atmosphere or an atmosphere that might create failure.  I guess there's nothing that

prohibits future motions to modify conditions of release as a track record continues to be built. Okay? That's the Court's ruling on ECF 114.

All right. Let's take up ECF 91. Attorney Near, go ahead.

MS. NEAR: Thank you, your Honor.

I believe this came up earlier before your Honor but certainly before Judge Nagala that the Government provided a no contact list and that was a condition of his release, that he not have contact with a number of people, and certainly a number of the people on the list makes sense. There's been no objection to other involved parties in terms of involvement in this case, potential witnesses.

But what seems unusual is that it included Mr. Schwab's girlfriend who is a serious relationship. She has been a significant emotional support for him. And as I indicated to Judge Nagala when we were last before here I had not seen anything in the record other than the fact that she was Mr. Schwab's girlfriend to suggest that there was any reason to include her on a no contact list.

The Government had indicated that it had information substantiating it's claim that she should be on that list. They were given 48 hours to provide it and that document was filed under seal as part of the motion

to modify.

And you know, a couple of things.  One, you know, looking at this report which from best I can tell has not been investigated further, has not been substantiated, I don't know what -- and I think I inquired of Attorney Pierpont who I understand is not here, so I'm not going to say more except to say I have not received any evidence of what flight this relates to, whether any such miles were actually used, that there was actually any type of misconduct or knowledge by Ms. Waites (phonetic) that would implicate her in any way.

I think also in terms of, you know, the Government in its reply raises two things.  One says, and I think the language they used is that she herself was part of a group that was engaged in some kind of fraudulent conduct and I don't see any evidence of that.  I hadn't been provided any evidence of that and even this one standalone complete which I don't think, I can't say definitively, wasn't even produced in discovery, warrants her inclusion on a no contact list when certainly her engagement with Mr. Schwab, her ability to speak with him, has been a real positive protective factor.  And I think to your Honor's point that we want him to be successful, perhaps we don't want to overwhelm him with, you know, too much freedom, is that having somebody in his life who is

like family to him is the kind of thing that we want to give him to try to be as successful as he can.

And certainly the --

THE COURT:  How long have they been together?

MS. NEAR:  The have been together for over a year?

(Pause.)

MS. NEAR:  That's what I thought.  They've known each other for some time but they've been together for over a year and she has stood by him through this.  The Government mentions in its response that there was some conversations on the phone.  You know, there's nothing in those conversations that has not been discussed or disclosed by the Defense in court relative to his resources, and having a loved one help you, a trusted love one, help you navigate life when you are incarcerated is not unusual.  If anything that's further evidence that she is a positive person, somebody that's trustworthy.

She has a relationship with Mr. and Mrs. Schwab. They've gotten to know her well.  So this is not some person who was part of Mr. Schwab's life who is an unknown to the rest of the family.  She is like family.

And so to include her on the list again the Court has the authority to impose a no contact order but it has to be -- those conditions have to be the least

restrictive to ensure the safety of the community and his appearance at court.  And I don't see any evidence of how his ability to speak, have contact with Ms. Waites, impacts the safety of the community in any way.

There is a letter from her attorney which lends further support to her own good standing and good moral character.  I suspect the reason I did not get this IC3 complaint in the original discovery, and I can't say 100 percent, Attorney Peck will correct me if that's wrong, but I think the reason I hadn't seen it at the time we were talking about it at the bond hearing is because it wasn't material because she's not a suspect, because she's not being investigated.  And so to add her to the list feels more punitive than it does -- that it is reflective of the Government's legitimate concern that his contact with Ms. Waites would adversely affect the safety of the community or his ability to appear in court.

THE COURT:  So your ask at this point is for phone contact supervised by Mr. and Mrs. Schwab.

MS. NEAR:  Yes.  I mean I will be candid that there is going to be a time I'm going to ask for her to be able to see him.

THE COURT:  Oh, I figured that.

MS. NEAR:  Yes.  But to your point that we are taking this one bite at a time that is a good starting

place. And I think showing that he can do that, that he can remain compliant with that is a good place to start because this is an important relationship. The fact that they have not been able to have any contact and the fact that they have not been able to see each other, although She did appear in court for one of his hearings, she made that kind of effort to be here and support him.

The fact that they are still together and trying to be together I think is demonstrative of not a one-off relationship. This is not a casual relationship. That this is a serious relationship and one that is important to his success on bond because having somebody to talk to who means so much to him is just a positive. We don't -- your Honor doesn't release people on bonds so they have nobody in their community. He has amazing loving parents. He has, you know, extended family who have supported him. But this is an important support too.

And I think the frankly technical fact that they're not married shouldn't mean that he doesn't have a First Amendment right of association as does she that warrants serious consideration of whether it's really appropriate for her to be on the no contact list.

The only times I've had spouses or significant others on a no contact list is when they are a co-defendant or when they are a clear witness in the case.

Neither of those are true to any degree in this case that I have been told.  And if something is changed it seems like it would be unusual that I would hear it today.

So for those reasons we would ask to start at least with the ability for him to speak with Ms. Waites on the phone in the presence of one of his parents.  He can't use his own phone for any other reason other than to consult with his team anyway.  So that's the only way he's able to speak with anyone.

THE COURT:  All right.  Attorney Peck?

MS. PECK:  First, I just want to address one thing about the attorney who wrote the letter.  I would note the circumstances are not what he was suggesting.

When the agents were in Las Vegas --

THE COURT:  I read the letter, the back and forth between you and him about what happened or whatever it is, it's really immaterial to this decision so you don't have to spend any time on it.

MS. PECK:  Okay.  The deal with the American Airlines scheme is this:  American Airlines was starting to hear from various of their Advantage customers that they couldn't access their account.  And they had heard from a number of different customers that they could no longer use their user name and their this and that and it turned out that American Airlines looked into it and found

out that those accounts had been hacked.

In looking into it further they determined that there was various persons that were showing up as the ones that were using the miles, that tickets had actually been issued in the names of people and that travel had actually taken place.

When the FBI found out about it there had been IC3 complaints that were provided to -- that the FBI could access and look into it. And there was several people that had been hacked in that way. In looking at the names of the people that were using the miles the agents recognized the names as people that were associated with this Defendant, including this Defendant but a number of others as well. His roommate, various other people, including people that showed up on his call list at Wyatt and Shay Waites was one of those people, so that travel miles were used and a ticket issued in her name.

THE COURT: Was it only this one time reflected in 93-1?

MS. PECK: I'd have to check to make sure. I know that that is an example of one. I know that the person that was issued a ticket at the same time was not the Defendant but somebody else that was associated with this Defendant. In other words, the flying was not being done by -- at least according to what was --

THE COURT: Right. It looked like -- am I allowed to say the two names? Is there some --

MS. PECK: I don't --

THE COURT: There was a Yung Sabbat Pottinger (phonetic).

MS. PECK: Yeah.

THE COURT: And Shay Waites.

MS. PECK: Yeah. And Yung Sabbat Pottinger shows up on some other accounts.

THE COURT: Is that a real person?

MS. PECK: Yes.

THE COURT: Okay.

MS. PECK: And a real person's --

THE COURT: Is that a real person separate and apart from Mr. Schwab or is it an alias used by Mr. Schwab allegedly?

MS. PECK: It's not an alias used by Mr. Schwab as a real person but it's an associate of Mr. Schwab.

THE COURT: Okay. And I thought that the order was to provide any and all information that showed Ms. Waites was a potential uninvited co-conspirator here. I assume that 93-1 is the only time that her name has appeared on a ticket. Are there others? Because that would be relevant.

MS. PECK: My agent isn't here today.

THE COURT: Okay.

MS. PECK: And he's unable to be here today because of other things. I will confirm that. We provided that complaint as one of the ones that we had of this scheme. I'm not aware of her being on another complaint.

THE COURT: Okay.

MS. PECK: I am aware of the scheme stealing about a million miles of American Advantage Miles and I am aware that there are a group of players who have used these miles. All of those people are on the no contact list.

THE COURT: Okay.

MS. PECK: So it's not as if -- there is absolutely no basis to suggest that the reason she's on this no contact list is anything other than that. I have no desire to -- I mean that we're violating her First Amendment rights or his or that we're being punitive. That's frankly a meritless claim. She's on the list because she was one of the people that was reported by American Airlines as having taken advantage of these hacked miles.

THE COURT: All right. So let's talk about 93-1. What was the date of the ticket that was issued in her name?

MS. PECK:  Hold on just one minute.

THE COURT:  My next question after that is going to be was the ticket used on that date and was it used by Ms. Waites.

MS. PECK:  I believe, but I can't say for sure, when they say it's transaction date of 2/11/2024 that that would be the date a ticket was issued because the transaction amount is $1,003.

THE COURT:  Right.  So that might be the date the ticket was issued.  And what was the date of travel for which the ticket was issued on that date?

MS. PECK:  It looks like it was ticket departing from Miami.

THE COURT:  Okay.  Going to?

MS. PECK:  I'm not sure.  They, American Airlines, it indicates that American Airlines --

THE COURT:  So the transaction is 11/2 --

MS. PECK:  2024.

THE COURT:  2024.  So I'm going to assume that's November 2nd and it's not --

MS. PECK:  2/11.

THE COURT:  2/11.

MS. PECK:  Yeah, as far as I know, although it looks to me like the --

THE COURT:  So we don't know the date of travel

and it looked like it was going from Miami to somewhere else?

MS. PECK: Yes. And we know the transaction amount for this particular one was a thousand dollar flight.

THE COURT: Do we know that Ms. Waites actually traveled under that ticket?

MS. PECK: We know that a ticket was issued in her name. That's what American Airlines reported to the agent.

THE COURT: So from my perspective there's 4 possibilities, right? There's Ms. Waites did the hack and issued a ticket in her own name. Ms. Waites participated in the hack and had a ticket issued in her name and maybe she participated with others. Third, she had no participation in the hack whatsoever and flew on the ticket knowing that it was procured through fraudulent activity, or four, she had no idea how the ticket was acquired and just traveled on the ticket.

So just to give you an example, I just got back from a trip that I had nothing to do with the arrangements. My wife did it all. I didn't buy the ticket, I didn't get confirmation in an email about the ticket. I never saw the confirmation number. My wife checked us in. The only thing I got from my wife a half

hour before we left on the trip was my boarding pass mobile.  The boarding pass just allows me to get on the flight.  It tells me nothing about the flight whatsoever in terms of who paid for it, what date the ticket was issued or how it was acquired.  So hypothetically if my wife hacked somebody and got me the ticket, I would have no idea.  All I saw was the boarding pass and I got on the flight.

So to me Ms. Waites' name on the ticket doesn't necessarily mean she committed fraud or even knew that the ticket was fraudulently acquired.  So I'm curious what evidence the Government has that -- from American Airlines.  I'm assuming American Airlines is able to know if somebody -- they would have had to send a confirmation to somebody after the ticket was booked with a confirmation number.  What email did that go to?  What phone number was provided, whose phone number is it, did it go to an email that is Ms. Waites' email?  I assume they know the IP address that was from their records which access and booked the ticket?  Is that IP address traceable back to Ms. Waites in some way?

I don't know that the name on the ticket one time, and this is why if it was done five or six times it would be relevant, but one time is all we have right now in 93-1 and I'm not sure that means she committed fraud.

MS. PECK:  I agree.  I think that there are repeat players in this scheme.  There are people that have shown up and there are people that are associated with her.  I mean I know that, for example, the roommate of Mr. Schwab in LA is also part of this.  He shows up on these has having tickets issued to him.  And she's in contact with him when she's dealing with trying to sell various items, you know, of jewelry and other things.  And he's one of the people that she is going to for those kind of things.

The agent has spoken to American Airlines about some of these complaints and I can find out more information about Ms. Waites.  I haven't been able to talk to the agent.  He has been away and also dealing with immigration stuff for 30 days, so it's been a little difficult right now to deal with federal law enforcement.  But I can make an inquiry of him upon his return about exactly what they told him about this particular complaint and, you know, whether there's some additional information that American Airlines has provided.  At this point I'm not aware of it.

THE COURT:  Okay.  So I suppose the -- would it be fair to say at this moment the Government has no evidence to charge Ms. Waites with any kind of fraud related to the American Airlines hack?

MS. PECK: Well, I couldn't charge this fraud right now if I wanted to because I don't think I have venue.

THE COURT: Let's hypothetically assume you did. Do you have enough evidence to charge Ms. Waites?

MS. PECK: (Indiscernible crosstalk) investigation, I mean I don't think we have no evidence, I think we have leads that we would need to follow before we even charge anybody. And that would include Mr. Schwab. I mean we have evidence to suggest that he was involved in this American Airlines scheme but would I be able to charge him at this moment with that? No. I'd certainly have to do additional work. Do I believe that he was involved? Absolutely. Given the nature of the scheme, given the fact that he used -- or one of the identities that was used to pay for stuff and this kidnapping was one of these American Airlines individuals.

THE COURT: No, that I know from the various affidavits.

MS. PECK: There is a relationship between what happened in this particular thing and this case. The precise parameters of the involvement of each person that I know has gotten tickets based on this illegal hacking of these people's accounts, to charge any of those people would require some additional work.

THE COURT:  I mean at this moment we don't even know if the ticket was even used or by whom, or whether she used it.

MS. PECK:  Well, I know that the miles could not be placed back in someone's account because the travel had taken place.  That was when American Airlines was -- and one of the reasons why all of these people reported the cyber fraud to IC3 was beings the miles were effectively stolen and used for travel.

THE COURT:  All right.  Given the state of the Government's evidence at the moment and given that essentially while he was in Wyatt Mr. Schwab had unfettered access to calling Ms. Waites on the phone and obviously did, why is the limited ask of him being on speakerphone supervised by his parents to have conversations with by phone something that poses a danger to the safety of the community?  I assume the government has all of the recordings of his phone conversations with Ms. Waites from Wyatt.

MS. PECK:  I believe we do.  I know that we had -- the ones I was referring to I think came from LAX when he -- I mean from LA when he was --

THE COURT:  There?

MS. PECK:  -- there.

THE COURT:  Is there any reason to believe that

-- do we know for a fact that he had phone conversations while in detention in this district or at Wyatt with Ms. Waites?

MS. PECK: You know, they had the tablet conversations and so I believe there were. It's a little bit different than it used to be about how to get the stuff from Wyatt, but I believe there were.

THE COURT: And is there any reason to believe that any of those involved any type of obstructive activity or criminal activity?

MS. PECK: Reasonably they involved money, discussions about money and sources for money, but not necessarily obstructive conduct. She's definitely somebody that he was discussing how to get funds with.

THE COURT: Which in and of itself is not obstructive or criminal.

MS. PECK: Correct.

THE COURT: I mean Attorney Near is correct that every -- the ones, the cases that you all cited to, I think there were two of them, the five or six others that we found where a no contact order was issued between spouses or significant others all involve situations where the significant other or spouse was either a co-defendant or a critical witness in the case, I don't see either of those here at the moment. And I do have to be sensitive

to the First Amendment associational rights which the case law indicates.

So what I'm trying to figure out is it doesn't appear to me at the moment that she is a critical witness in the counts that you have charged in the indictment, so the only other possibility is, you know, was she involved in this fraud somehow or did she knowingly make use of this ticket knowing that it was fraudulently procured.  At the moment I don't see that evidence either.

I know why you're inferring it's a possibility because her name is on a ticket and the ticket was used apparently.  But even if the ticket was used I'm not sure that necessarily means she knew it was acquired by fraud. So I mean it sounds like you have not all the information you need from your agent.

MS. PECK:  I think that's correct.

THE COURT:  Okay.  How long is it going to take you to get that?

MS. PECK:  I will talk to him when he returns back to the district which should be next week and find out if he can have further conversations with the American Airlines rep.  I know he's had some conversations with them previous.  I will find out if he can get me more specifics about Ms. Waites and what may have been communicated with her.

THE COURT:  The problem is this motion was filed on July 25.

MS. PECK:  I understand that.  You know, it is what it is as far as my ability to --

THE COURT:  No, believe me, I understand the situation you're in.  The administration has obviously chosen its priorities and --

MS. PECK:  Correct.

THE COURT:  I don't know that that's my problem or the Defendant's problem.  I'll give you a modest amount of time but I think I've got to rule on this motion.

MS. NEAR:  Your Honor, may I also just --

THE COURT:  Yes.

MS. NEAR:  The agent was at every single hearing.

THE COURT: I know.

MS. NEAR:  The agent was at the hearing when Judge Nagala gave them 48 hours to produce anything they had, anything that substantiated their claim that she belonged on the no contact list.  The agent was sitting there when that directive was given.  Presumably the agent is the one who then turned around and provided this information to Attorney Peck.  I called and inquired do you have any evidence of where the ticket went, where the flight went.  Was she on the plane, did she even use the

ticket, anything. Because I'll represent that the other, the American -- they subpoenaed everything from American Airlines. There's a considerable amount of discovery on it. I've seen them investigate other IC3s. There's nothing more on this.

And presumably if the Government really wanted to convince the Court that she should be on the no contact list, they would have given me everything they had in that first disclosure order by Judge Nagala with the agent sitting at the table. So I don't see what the agent is going to add that wouldn't have added when they had their first and best opportunity to present that evidence.

MS. PECK: That's not accurate. First of all, the agent was not with me when Judge Nagala signed this order. He was obviously the only one in the court in July.

Second of all, the American Airlines discovery that's been provided deals with the crew that came out of St. Louis to Connecticut in order to kidnap the victims in this case.

MS. NEAR: That's not accurate.

MS. PECK: Well, that's where the bulk of the American Airlines discovery is.

MS. NEAR: Your Honor, I can show you the IC3s I have from other people.

MS. PECK:  You have IC3s.  That's not from the American Airlines, that's not subpoenaed from American Airlines.  The material that was subpoenaed from American Airlines has to do with the flights of four individuals from St. Louis to Westchester in August of 2024.

THE COURT:  Some of the questions I'm interested in are has anyone obtained the ticket confirmation from American Airlines.  Does that ticket confirmation go to a particular email address, whose email address did it go to.  Does American Airlines, based on whatever internal investigation they conducted, know the IP address of who booked this particular ticket that is in 93-1.  Has any investigative work on that IP address.  I'd like to know that.

MS. PECK:  Well, I would say, your Honor, I mean the American Airlines things that we've subpoenaed are direct evidence of the crime that's under indictment.  These IC3 complaints are an issue about Mr. Schwab and his abilities to hack into various accounts and his use of other people's identifications.  Those kind of things are very relevant to the bond, but it's a different matter than the actual investigations that have one on as to the underlying crime here.

So in fairness to the agents, they've been dealing with the latter --

THE COURT: Yes, I understand.

MS. PECK: -- rather than the former. I can get or I can see if they can get more information about Ms. Waites' ticket, but I would say that this is a detention issue different than the underlying crime issue.

So we turned over IC3 complaints that we got, absolutely, but we don't have, you know, a subpoenaed record for all of the IC3 complaints because they are an issue that's tangential to the underlying case. I can make efforts to get more information about Ms. Waites' ticket and find out what American Airlines may have, but to suggest that we have, you know, done a huge investigation of these other IC3 complaints is not true. We have talked to American Airlines or the agents have talked to American Airlines about certain aspects of that. They got the complaints themselves and they had some conversations with the woman whose identity was used in our case.

THE COURT: When is your agent done with his ICE detail?

MS. PECK: I'm going to talk to him on Monday and find out his precise schedule, but they've been sending people out on 30-day detail, so it's been difficult. But I will find out from him. I'll call him when I get back and I will find out from him if he's

Case 3:25-cr-00030-SVN   Document 131   Filed 10/28/25   Page 49 of 53

49

around next week and if we can try to nail this down.  If we can, we can.  If we can't, we can't.  You know, that's just the situation I'm in with the resources I have.

MS. NEAR:  I will just add, your Honor, that I don't know how far we'll get because the report actually says that American Airlines did reverse the mileage transaction before the trip was made.  So I think that answers the question.

MS. PECK:  I don't think that's exactly -- I have reason to think that's not necessarily correct.

MS. NEAR:  I don't know why that would be incorrect but everything else in the report is correct.

THE COURT:  All right.  Here is where I'm headed on this.  Based on what I have right now in just 93-1 I'm inclined to grant the motion and permit the phone contact supervised by the parents on speakerphone.  I'm not going to make that ruling yet but that's where I'm headed.

I will give the Government until next Friday to provide whatever additional information it wants to provide and then I'll make my ruling.  If at some point down the road you uncover more evidence you can always come back on a motion to modify the conditions yourself and remove that phone contact if there is a reason to do it, but based on the record I have in front of me right now I can't conclude that Ms. Waites did anything wrong

Falzarano Court Reporters, LLC

yet that justifies being on the no contact list in light of First Amendment associational rights and the fact that I think it is the Government's burden at this point to demonstrate the supposed danger in some way. And right now what I have in front of me doesn't come anywhere close.

So that's kind of where I'm headed but I'll give you the opportunity until next Friday. We're not going to do another hearing. Mr. Schwab does not have to travel back here. If we have anything in person it will just be counsel, but most likely I'll probably just end up taking it on the papers. You can submit whatever you want to submit under seal by next Friday.

MS. PECK: Okay.

THE COURT: And then I'll make my ruling.

MS. PECK: Thank you, your Honor.

THE COURT: All right.

MS. NEAR: Your honor, I just wanted to note one thing. I'm not going to take it up today, I'm just putting it on your future radar. We are trying to puzzle through a solution to the discovery issue in terms of facilitating his ability to review discovery. Right now it involves driving him two hours to Atlanta, letting him sit in a room for a period of time and come back. Discovery is voluminous. I understand from Attorney Peck

we have more coming next week.  So I just wanted to --

THE COURT:  Where in Atlanta do you go to review the discovery?

MS. NEAR:  An attorney's office.  But it's not --

THE COURT:  Okay.

MS. NEAR:  It's obviously not --

THE COURT:  It's not the U.S. Attorney's Office in Atlanta or anything like that.

MS. NEAR:  No, no.  It's defense counsel's office but it's been -- I mean talking about more work for Probation, I mean getting to Atlanta, spending the time there and coming back.  So we are trying to strategize some different ideas that we will probably come back and propose to your Honor.  Of course consult with the Government and Probation, but we're just trying to find a way forward whether that involves something comparable to what they have at Wyatt where they have preloaded discovery on laptops that has no access to the internet. We're just trying to come up with some solutions.

So I'm just putting it on your radar that we will be back at some point.  We will have vetted a proposal that we hope works with his conditions.

THE COURT:  Maybe by some miracle the two of you will reach an agreement.

MS. NEAR:  That would be amazing. (Indiscernible – background noise.)

THE COURT:  All right.  We're in recess.  Thank you all.

COURTROOM DEPUTY:  All rise.  The Honorable United States District Court for the District of Connecticut is now in recess.

(Proceedings adjourned at 3:26 p.m.)

CERTIFICATE


I hereby certify that the foregoing 52 pages are a complete and accurate transcription to the best of my ability of the electronic recording of the Bond Motion Hearing in re:  UNITED STATES OF AMERICA vs. JAMES SCHWAB, Criminal No. 3:25-CR-00030(SVN-1) held before The Hon. S. Dave Vatti, United States Magistrate Judge, at the United States Courthouse in Bridgeport, Connecticut on August 22, 2025.

_Suzanne Benoit_

_____

Suzanne Benoit, Transcriber          Date:  10/28/2025