UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | 3:25CR30(SVN) |
| ADAM IZA | : | September 2, 2026 |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Government respectfully submits this memorandum in advance of defendant Adam Iza's sentencing, scheduled for September 9, 2026 at 10:30 A.M. After sentence is imposed in this District, the defendant will be sentenced in the Central District of California for serious charges involving public corruption, a multi-million dollar fraud scheme, and the attendant tax crimes that arose from that scheme. As this Court is aware, the defendant's crime here, unrelated to his federal case in California, is exceedingly serious and he, along with his compatriot James Schwab, are the most culpable conspirators in this case. The defendant's conduct involved extended premeditation and planning, the recruitment of others to do his bidding and take the risks, an enthusiasm for extreme violence, and the willingness to impose physical and psychological trauma on vulnerable victims to satisfy his own greed and arrogance. Further, he has demonstrated contempt for the law and, given his track record, is highly likely to offend again. Given the facts and circumstances of this case and this defendant, the factors that bear on the sentence weigh in favor of a very substantial term of imprisonment here, one within the range as calculated by the Government.

## I. PROCEDURAL BACKGROUND

On October 28, 2025, a federal grand jury returned a superseding indictment against Adam Iza and his co-defendants, charging him in Count One with Conspiracy to Commit Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a), and in Count Two with Conspiracy to Commit

Kidnapping, in violation of 18 U.S.C. § 1201(c). Doc. 132. Iza, who was in custody in California based on unrelated federal charges there, was presented in this District on January 9, 2026, Doc. 157, and ordered detained by United States Magistrate S. Dave Vatti. Doc. 159. On June 1, 2026, the defendant entered a guilty plea to Count One, Doc. 201, pursuant to a plea agreement. Doc. 204. The Probation Office prepared a draft Presentence Report, which was filed on July 14, 2026, Doc. 236, and the final Presentence Report was filed on July 31, 2026, with an addendum containing the defendant's objections. Doc. 260. The Government's response to those objections was included in the Second Addendum, filed on August 17, 2026. Doc. 279. The defendant filed a sentencing memorandum on August 13, 2026, including various exhibits. Doc. 275-277. The sentencing is scheduled to take place on September 9, 2026 at 10:30 AM.

## II. THE GUIDELINES CALCULATION

### ***The Calculation***

The Presentence Report ("PSR"), in line with the Government's calculation set forth in the parties' plea agreement, Doc. 204 at 4, calculates the adjusted offense level, prior to any credit for acceptance of responsibility, to be 38. As noted, the base offense level under U.S.S.G. § 2B3.1(a) is 20. PSR at 25, ¶ 93. A four-level increase was applied under U.S.S.G. § 2B3.1(b)(2)(D) for the use of weapons, specifically, metal bats, to beat the victims who were then restrained with duct tape, including, as to one of the victims, over his face. *Id.* at ¶ 94. An additional four levels was added due to the serious bodily injuries suffered by the victims, in particular, S.C. who suffered a broken arm and a severely battered face after he was beaten, dragged from his vehicle, smashed repeatedly with baseball bats, bound with duct tape, and thrown bodily into the back of a cargo van. *Id.* at ¶ 95. Given the forcible abduction of two victims in the course of the crime, four levels were added under U.S.S.G. § 2B3.1(b)(4)(A); PSR

at 25-26, ¶ 96. The two-level enhancement for a carjacking was also applied because the victims were rear-ended by one car, surrounded by two other vehicles, and dragged from their Lamborghini SUV, which was then driven from the scene by one of the kidnappers with the victims' possessions inside the vehicle. U.S.S.G. § 2B3.1(b)(5); PSR at 26, ¶ 97. The PSR added four levels for Iza's role in the offense, that is, as an organizer/leader of a criminal activity involving at least 5 participants. U.S.S.G. § 3B1.1(a). With these enhancements, the adjusted offense level is 38.

The PSR does not include any enhancement for obstruction of justice under U.S.S.G. § 3C1.1, *see* PSR at 26, ¶ 100, but since the filing of the PSR, the defendant has engaged in obstructive conduct that warrants a two-level increase. Specifically, as discussed in more detail in a later section of this Memorandum, the defendant has "provid[ed] materially false information" to this Court. U.S.S.G. § 3C1.1, comment. n.4(A). In an effort to deny that he was the person directing the criminal action in Danbury through the Telegram account with display name "C," the defendant has falsely implicated another individual, claiming that person was "C" rather than Iza. Not only is there no evidence to support this assertion, but the defendant purposefully misrepresents evidence found on his phone, submitted as exhibits to his sentencing memorandum, to try to lay the blame elsewhere. *See* Defense Exhs. I & J. While the defendant is under no obligation to admit to all evidence against him, he cannot lie on a material matter to the Court without consequence. Accordingly, the obstruction enhancement should apply here.

Relatedly, his actions are inconsistent with acceptance of responsibility. *See* U.S.S.G. § 3E1.1, comment. n.4 ("Conduct resulting in an enhancement under § 3C1.1 . . . ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct"). Thus, the Government opposes any credit for acceptance. *See* June 1, 2026 Plea Agreement at 3-4 ("The

Government's recommendation and motion are each conditioned on the defendant's affirmative acceptance of responsibility. If, in the Government's assessment, the defendant engages in any act or omission or takes any litigating position inconsistent with affirmative acceptance of responsibility, the Government is not obligated to (1) recommend a two-point reduction under § 3E1.1(a), or (2) file a third-point motion under § 3E1.1(b) (even if the Court has granted a two-point reduction, and even if the defendant's notification of his intention to enter a plea of guilty permitted the Government to avoid trial preparation")).

With the enhancements as set forth above, the defendant's adjusted offense level is 40. With a Criminal History Category of I, PSR at 29, ¶ 110, the defendant's sentencing range is 292-365 months' imprisonment. U.S.S.G. Ch. 5 Pt. A (Sentencing Table).

***<u>The Defendant's Responsibility for the Enhancements</u>***

The defendant disputes the role enhancement applied by Probation, claiming that the role he admittedly played as "Kusha" does not rise to the level of a leader under the Guidelines. He also disputes the applicability of the other enhancements applied in the PSR, asserting that he did not participate in the kidnapping and thus is not responsible for what happened to the victims. He is wrong on both points.

<u>Leadership Role</u>

The PSR correctly considered the defendant to be an organizer/leader of a criminal activity that involved five or more participants under U.S.S.G. § 3B1.1(a). The Commentary to that section notes various factors the Court should consider when deciding whether a defendant was an organizer/leader. *See* Note 4. These include the exercise of decision-making authority, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in the planning or organizing of the scheme, and the degree of control and

authority exercised over others. *Id.* All these factors support a finding that Iza was a leader of the criminal scheme in this case.

Preliminarily, the criminal activity here involved five or more participants, even considering only those involved when the St. Louis crew was present in Connecticut – the defendant, James Schwab, Saif Faiq, Martel Williams, Sedric Louis, John Davis, and Angel Borrero. And when Borrero's compatriots from Miami came on board at the request of Iza, five more criminal participants were added to the conspiracy. As for the defendant's leadership role, his communications with the other conspirators make his authority readily apparent.

Focusing first on the communications between Iza, a/k/a "Kusha," and the St. Louis conspirators, the defendant consistently directed the actions of the others:


heres what you need to do if you get in there
ask him where the ledgers are and then retrieve them
Sent
Kusha 8/23/2024 12:50:11.000 PM

they should be on his computer desk
Sent
Kusha 8/23/2024 12:50:16.000 PM

then make him open it
Sent
Kusha 8/23/2024 12:50:19.000 PM

and tell him to send the stolen bitcoin
Sent
Kusha 8/23/2024 12:50:24.000 PM

all of it
Sent
Kusha 8/23/2024 12:50:26.000 PM

and then on his desktop telegram
Sent
Kusha 8/23/2024 12:50:33.000 PM

message my username
Sent
Kusha 8/23/2024 12:50:35.000 PM

KUSH4553
Sent
Kusha 8/23/2024 12:50:37.000 PM

from his acc
Sent
Kusha 8/23/2024 12:50:39.000 PM

and from there
Sent
Kusha 8/23/2024 12:50:41.000 PM

i will paste the bitcoin address
Sent
Kusha 8/23/2024 12:50:45.000 PM

so he can copy it on his computer
Sent
Kusha 8/23/2024 12:50:48.000 PM

but we wanna make sure we get the btc before we leave
Sent
Kusha 8/23/2024 12:51:01.000 PM

you can call me while you in there
Sent
Kusha 8/23/2024 12:51:14.000 PM

ill tell you what to do
Sent
Kusha 8/23/2024 12:51:16.000 PM

*See* PSR at 13-14, ¶ 39. These messages not only show Iza directing the others but also indicate his plan to exercise control over the stolen Bitcoin, explicitly "all of it." He also instructed them what to do and not do as shown in the following messages – stop knocking on the door, wait for the parents to return, and when they do, "knock [them] out."







*See* PSR at 14-15, ¶¶ 42-46. The "boy in the car" to whom Iza refers was Angel Borrero who was also taking orders from Iza simultaneously with the crew from St. Louis.

Additionally, Iza promised payment to the other conspirators, indicating his role as a recruiter and organizer.




When issues arose, Faiq told his compatriots over Telegram to "text [KUSH4553] on telegram" and to "Call dude [Iza] n figure this shit out," indicating Iza's decision-making authority. PSR at 15, ¶ 48.

Iza's initial communications over Telegram with Angel Borrero, who was acting as a scout for Iza when the St. Louis group was seeking an opportunity to force Chetal's hand, show Iza's position of command: "Go here [to the Chetals' neighborhood]" and "get there." When he did not like Borrero's timing, he castigated him: "We can't work on this schedule. You can just leave. We got it from here." As Borrero tried to appease him, Iza gave him preemptory commands: "Send me a pic . . . Just show me your view . . . park closer . . . Follow [the parents' SUV] . . . Stay on them." *See* PSR at 13-15, ¶¶ 39-46. When the St. Louis conspirators expressed reluctance to continue, Iza recruited Borrero to do his bidding: "strategize with them and do whatever it takes to get this done – your commission is saved . . . ill take care of your expenses in time." He also recruited Borrero's Miami associates for the job: "you can fly your boy out + anyone else you think is good for it . . . tell them to fly out and ill cash app them for the flight rn." And Iza was explicit about what he expected them to do:




From: 6561470120 C
Follow them until they stop somewhere
Priority: Normal
Status: Read
Platform:
8/24/2024 8:53:05 PM(UTC+0)

From: 6561470120 C
Then grab them
Priority: Normal
Status: Read
Platform:
8/24/2024 8:53:13 PM(UTC+0)

From: 6561470120 C
Don't matter what the circumstance is
Priority: Normal
Status: Read
Platform:
8/24/2024 8:53:23 PM(UTC+0)

From: 6561470120 C
Just get it done
Priority: Normal
Status: Read
Platform:
8/24/2024 8:53:25 PM(UTC+0)

*See* PSR at 16-17, ¶¶ 52-55. And about the equipment they would need to follow his orders, Iza specified what they should buy:


From: 6561470120 C
We need supplies
Priority: Normal
Status: Read
Platform:
8/23/2024 10:23:00 PM(UTC+0)

From: 6561470120 C
Zip ties
Priority: Normal
Status: Read
Platform:
8/23/2024 10:23:04 PM(UTC+0)

From: 6561470120 C
Yea go get a bunch of stuff
Priority: Normal
Status: Read
Platform:
8/23/2024 11:40:28 PM(UTC+0)

From: 6561470120 C
Hammers
Metal bats
All the shut
Priority: Normal
Status: Read
Platform:
8/23/2024 11:40:33 PM(UTC+0)

PSR at 17, ¶ 55. For doing as he directed, Iza promised monetary assistance and rich rewards –


From: 6561470120 C
If they do everything right.
We'll sponsor bail + lawyers, etc
Priority: Normal
Status: Read
Platform:
8/23/2024 10:04:07 PM(UTC+0)

From: 6561470120 C
theres $1m in watches inside lol
Priority: Normal
Status: Read
Platform:
8/25/2024 12:01:17 AM(UTC+0)


From: 6561470120 C
well make him drop that shit off to yall too as part of the ransom
Priority: Normal
Status: Read
Platform:
8/25/2024 12:01:35 AM(UTC+0)

In short, the evidence demonstrates clearly that Iza acted as a leader (directing the actions of others), a recruiter (soliciting assistance through financial rewards), an organizer (working with Schwab to pay for logistical expenses and coordinating the actions of his compatriots), and one of the anticipated primary beneficiaries of the criminal scheme (expecting control of tens of millions in cryptocurrency).[1] The four-level increase under U.S.S.G. § 3B1.1(a) is entirely appropriate here.

Relevant Conduct

Under U.S.S.G. § 1B1.3, the defendant is held accountable for "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by [him]," § 1B1.3(a)(1)(A), and, as to jointly undertaken criminal activity, for all acts and omissions within the scope of, in furtherance of, and reasonably foreseeable in connection with that criminal activity. § 1B1.3(a)(1)(B). Under each of these provisions, the defendant is accountable for all that happened to the victims in this case, justifying the enhancements applied by the Probation Office.

As one of the primary instigators, planners, and directors of the plot, Iza was knowledgeable of, involved in, and in charge of all aspects of the criminal activity. The evidence shows he "aided, abetted, counseled, commanded, induced, procured, and willfully caused" all actions taken during the sustained effort to force Veer Chetal to surrender control to Iza of approximately $50 million in stolen Bitcoin, including the violent abduction of his parents. The chats set forth above show the efforts he made to counsel, command, induce and procure both the home invasion robbery and the kidnapping of R.C. and S.C. As "Kusha" on Telegram, he

[1] In his Telegram communications with Reynaldo Diaz, Iza also exercised his authority, telling Diaz, "We're handling the crypto side on our team . . . We just need y'all to grab the parents when they leave – Put them in the van – And take them anywhere . . . grab this Indian [son] of a bitch. Dad or mom Or both." *See* PSR at 17, ¶¶ 56-57.

ordered those on the ground in Danbury to get the ledgers from Veer Chetal, "then make him open it and tell him to send the bitcoin all of it" to Iza. PSR at 14, ¶ 39. He instructed Borrero, who was following the parents, to send the address of their current location because "we just gonna grab em . . . throw them in the van." *Id.* at ¶ 45. When Borrero gave Iza the heads up that the parents were heading home, Iza, a/k/a/ "Kusha," commanded his St. Louis associates – "Lets fucking do this . . . you need to find his room where the computer is – just knock out the parents, they old as fuck." Certainly, Iza was inducing and commanding both the forcible entry into the Chetals' home and violence against Veer Chetal's parents, including their abduction. While the St. Louis crew was still there, Iza instructed Borrero to get the van and steal tags to replace the license plates on the van before they grabbed the parents, and Borrero did so along with procuring "duct tape n all," as he informed Iza. PSR at 15, ¶ 49. Iza's plan was for Borrero to assist the St. Louis crew, and he told them over Telegram that Borrero would help them "strategize" and would "be there to help yall too." *See id.* at ¶ 49. He pushed the St. Louis guys, to complete the job with Borrero's help: "ill throw 50k for each guy after we're good." *Id.* at 16, ¶ 50. The promise of $50,000 each is a sizable inducement.

To hedge his bets, Iza began procuring Borrero's help while still trying to convince the St. Louis crew to stay the course. He messaged Borrero, "switch the van with the honda so you can go watch the place. We need to verify which unit is 100% before we do anything . . . ill take care of your expenses and time . . . we're gonna assemble a whole army . . . If it goes right we'll break off $100k each guy yourself included." *See* PSR at 16, ¶ 52. When the St. Louis conspirators expressed their intention to leave, Iza immediately solicited Borrero to bring in his "homies," offering to pay for their flights. *Id.* at ¶ 53. Once they were in place in Connecticut, he commanded violent action: either they would force their way inside Chetal's home and coerce

him to give them the crypto ledgers and the pins, followed by "knock[ing] him out cold" and ensuring "theres some brain damage," *id.* at ¶ 54, or they would "grab the fuckers parents" and "[t]ake them to the Airbnb in the woods." *Id.* He showed no qualms about hurting the parents, instructing Diaz to "knock them out right away – Do what you gotta do." *Id.* at ¶ 57.

He also instructed them to get restraints and weapons – zip ties, duct tape, hammers, metal bats. PSR at 17, ¶ 55. Thus, he intended that his accomplices would be armed and his victims restrained.[2]

Accordingly, the conduct that underlies the enhancements set forth in the PSR was all counseled, commanded, procured, induced, and willfully caused by Iza, and he is responsible for it. *See* U.S.S.G. § 1B1.3(a)(1)(A).

These acts – the abduction of Chetals' parents, the use of weapons, the serious bodily injury suffered by S.C., and the carjacking of the Lamborghini Iza directed Borrero and then Diaz to follow to find a location for the kidnapping – are also within the scope and in furtherance of, and reasonably foreseeable in connection with, criminal activity jointly undertaken by Iza and his co-conspirators. U.S.S.G. § 1B1.3(a)(1)(B). The Second Circuit has identified various factors that may be relevant to determining the scope of jointly undertaken criminal activity, including the agreement (explicit or implicit) between the defendant and the other participants, whether they pooled their resources, and whether the defendant took part in designing or executing the operation. *See United States v. Pica*, 106 F.4th 197, 201-02 (2d Cir. 2024) (quoting *United States v. Studley*, 47 F.3d 569, 575 (2d Cir. 1995) (citation omitted)). Here, Iza was one of the primary instigators, planners, and commanders of the entire operation to force Veer Chetal to turn over millions in Bitcoin. The evidence shows Iza's involvement starting shortly after the $238+

---

[2] Similarly, the St. Louis crew purchased air rifles and cartridges. PSR at 11, ¶ 29, at 22, ¶ 80.

million crypto heist became known, including coordinating logistics like recruitment of conspirators and provision of lodging, transportation, and supplies. He then spent three days communicating, at times moment-by-moment, with people on the ground, including his own brother, monitoring what was happening, seeking relevant information, providing intel about Chetal and his parents, and giving commands and instructions, including orders to abduct the parents and use violence against them. All that happened to the victims was not only reasonably foreseeable to Iza but directly ordered by him and was done in service to his objective to steal or extort millions in cryptocurrency. Thus, under U.S.S.G. § 1B1.3(a)(1)(B), he should be held accountable also. *See Pica*, 106 F.4th at 203 (defendant responsible for co-conspirator's use of deadly force in a Hobbs Act robbery attempt as he was involved in planning the robbery from the start, and was involved in orchestrating and facilitating it, including his associate's possession of a weapon); *United States v. Eisner*, 431 F. App'x 23, 26-27 (2d Cir. 2011) (defendant responsible for losses caused by co-participant in a Ponzi scheme due to his involvement in the initial development of the scheme, and his continued participation in and profit from the crime throughout its existence); *United States v. Medina*, 74 F.3d 413 (2d Cir. 1996) (defendant, who masterminded the robbery of a construction company and was aware his compatriots were armed, was properly held accountable under § 1B1.3 for a weapons enhancement).

***U.S.S.G. § 2X1.1***

The defendant's final argument about the application of the Guidelines is his assertion that his offense level should be reduced by three levels under U.S.S.G. § 2X1.1(b)(2) because "his conduct in the conspiracy concluded when the St. Louis group abandoned their attempt to rob Veer Chetal." Def. Memo at 21. Iza also claimed the robbery attempt was "doomed to fail" because the group had the wrong address. *Id.* Factually, Iza is incorrect. His conduct in the

conspiracy did *not* conclude when the St. Louis crew decided to leave as the evidence shows quite clearly, and he *had* learned the Chetals' correct address through his inside source while the group from St. Louis and Angel Borrero were still in Danbury. He quickly disclosed the correct unit number to his compatriots.




Iza is also wrong about the applicability of § 2X1.1(b)(2). That section provides for a three-level decrease of the offense level for a conspiracy unless a participant in the conspiracy completed all acts the conspirators believed necessary on their part for the successful completion of the substantive offense, or the circumstances show that they were about to complete all such acts but for apprehension or interruption by an event beyond their control. The "relevant question," according to the Second Circuit, is "whether the conspiracy ripened into a substantially completed offense or came close enough to fruition." *United States v. Luchtman*, 910 F.3d 33, 39 (2d Cir. 2018), (quoting *United States v. Downing*, 297 F.3d 52, 62 (2d Cir. 2002)). In *Luchtman*, the Second Circuit upheld the sentencing court's refusal to reduce the offense level under § 2X1.1(b)(2) where the defendant had initiated contact with a terrorist organization, pledged allegiance to that organization, planned an attack at a particular restaurant, and purchased weapons and supplies in preparation. His actions indicated that the conspiracy was sufficiently "ripened" to be deemed a substantially completed offense.

Similarly, in *United States v. Medina*, 74 F.3d 413, 418-19 (2d Cir. 1996), the Second Circuit upheld the denial of the reduction where the conspirators had taken steps to prepare for a robbery. They obtained a floor plan of the target premises, selected a date when large sums would be on the premises, procured firearms, masks, and restraints, drove to the location and

approached the door. The police stopped them before they could enter and complete the substantive crime. But the Second Circuit held that the conspirators had been "about to complete" the robbery, even if they were not "about to succeed," and the reduction was not applied. *See also United States v. Chapdelaine*, 989 F.2d 28, 36 (1st Cir. 1993) (cited in *Medina*) ("[N]ear accomplishment of the criminal object normally poses enough risk of actual harm, and reveals enough culpability" to defeat "the reduction available for conspiracies . . . that have not progressed very far"; a scheduling miscalculation doomed a robbery conspiracy but no reduction given when the robbers arrived with guns and disguises in tow); *United States v. Deas*, 768 F. App'x 81, 83 (2d Cir. 2019) (no § 2X1.1 reduction where defendant showed up for a robbery with a gun and mask expecting to go to the home of the target; his associate was an informant so the crime did not take place).

The facts in this case show that the conspiracy here was substantially completed and close to fruition; thus, the reduction under § 2X1.1(b)(2) does not apply. Members of the conspiracy, including Iza, had arranged for a group to travel from St. Louis to Connecticut and had procured lodging for them in an expansive home secluded in the woods. They obtained vehicles for them, including a large cargo van, and other supplies--a laptop, air rifles and cartridges, walkie-talkies, and duct tape. Iza prepped the group on what to do to gain control of the cryptocurrency Chetal controlled. The group spent nearly two days stalking the Chetals' home and following R.C. and S.C. as they drove around Danbury, scouting for the best place to grab them. Members of the conspiracy knocked repeatedly on the door of the unit they believed was the Chetals' residence to force their way inside and changed the plates on the van so that it could not be tracked by law enforcement once the crime was done. Iza gathered intel about the correct unit number and disclosed it to his compatriots in Danbury, sending Angel Borrero back

to the victims' neighborhood to confirm. All these actions were taken while the crew from St. Louis was in Connecticut, and this conduct alone indicates that the conspiracy "came close enough to fruition," *Luchtman*, 910 F.3d at 39 (internal citation omitted), to preclude a reduction under § 2X1.1.

But the conduct of the conspirators, including Iza, did not stop there. Iza, Borrero, and Schwab arranged for five more people to fly to Connecticut from Florida, and Iza instructed them to purchase metal bats, hammers, and zip ties, which they did. Then, for a day and a half, they conducted surveillance of the Chetals' home and tracked the parents when they drove in town, seeking an opportunity to abduct them. They picked their spot, rammed the victims' SUV from behind, blocked them in, dragged them from the car, beat them with bats and fists, bound them, threw them in the back of the cargo van, and headed out, intending to take them to the Airbnb rental in the woods and hold them for ransom, that is, approximately $50 million in Bitcoin. They were stymied by police, who had been alerted to the crime by 911 callers and an off-duty FBI supervisor, and chased down the van before it could reach its destination. These facts show that the conspirators, including Iza who was directing the kidnappers at the time of the abduction, were about to complete the crime they intended but for interruption and apprehension by law enforcement. Under these circumstances, § 2X1.1(b)(2), by its terms, does not authorize any decrease in offense level.

In sum, the evidence fully supports the application of the enhancements in the Presentence Report and the calculation of the defendant's offense level of 38. As noted above, the Government submits that the defendant has engaged in obstructive conduct before this Court and should receive the corresponding two-level enhancement under U.S.S.G. § 3C1.1, leading to a total offense level of 40.

## III. THE DEFENDANT'S SENTENCING MEMORANDUM

The primary thrust of the defendant's sentencing memorandum, as well as the objections he posed to the Presentence Report, is a claim that he is not the user of the Telegram account with the display name "C." The reason for his insistence in this regard is the fact that "C," whom the evidence clearly shows is Adam Iza, ordered those on the ground in Connecticut very explicitly to take violent action against Veer Chetal and his parents in a multi-day effort to get nearly $50 million in stolen cryptocurrency under his control. Among the instructions Iza as "C" gave the crew from Miami was the following:

To Angel Borrero – "This will go one of two ways. Either inside he gives the ledgers and the pins to them then knock him out cold and make sure theres brain damage . . . worst case we just grab this fuckers parents take them to the airbnb in the woods he'll pay to get them back -- just put them in the van." He directed them to purchase weapons and restraints– "Hammers. Metal bats" and "Zip ties." And he repeatedly ordered the abduction of Veer Chetal's parents, noting that "grabbing" them was "ideal," and that their abduction "puts it [the extortion] in the bag." To Reynaldo Diaz, he gave similar instructions – "we just need y'all to grab the parents when they leave, put them in the van, and take them anywhere, so we got leverage." "[K]nock them out right away. Do what you gotta do."

The directions, instructions, and orders given by Iza under the moniker "C" when communicating with Borrero and Diaz were much the same as those given by him as "Kusha" to the St. Louis group. (*See, e.g.* "Kusha" to "Joe Joe": "just wait for the parents to come back and then rush him . . . tbh might be better to just grab them – they're in open areas . . .just knock out the parents – they old as fuck.") In each of these chats, Iza – whether as "C" or as "Kusha" – directed his subordinate co-conspirators to be violent with Chetal *and* to violently abduct his

parents to force his hand. The kidnapping of Chetal's parents was discussed as an option from the beginning. So, even considering the directions Iza admittedly gave to his co-conspirators as "Kusha," he contemplated the violent abduction and restraint of Veer Chetal's parents to force him to relinquish the stolen cryptocurrency.

In his attempt to distance himself from Telegram user "C," Iza takes two approaches. First, he suggests that someone else who was known to use the moniker "CX" was "C." As discussed more fully below, and contrary to the insinuations made by Iza in his memorandum, there is no evidence that "CX," that is, Cameron Cureton, was Telegram user "C" or that he was involved in the robbery/kidnapping /extortion plot against Veer Chetal and his parents. Second, Iza attempts to minimize the substantial evidence that links him directly to the kidnapping and to the "C" Telegram account user who exchanged messages and calls with Borrero and Diaz to direct their actions in Connecticut. Relatedly, Iza tries to draw a distinct line between the part of the scheme that involved the three associates of Iza's brother Saif Faiq (Martel Williams, John Davis, and Sedric Louis) and the part that involved Angel Borrero's compatriots from Florida. The problem with this approach is that the objective was consistent throughout the scheme – to force Veer Chetal to turn over millions in stolen cryptocurrency to Iza and James Schwab – and certain participants, including, Iza, Schwab, and Angel Borrero, were involved from start to finish. Moreover, there is no line that can be drawn in the scheme; Iza was coordinating with Borrero to continue what he was doing for Iza and send for help in the form of willing associates even as he was pressing the St. Louis crew to finish the job. *See* PSR at 15, ¶ 49, as well as texts set forth below.

Addressing first Iza's connection to Telegram display name "C"-- in its response to the objections Iza posed to the Presentence Report, the Government laid out in some detail the

substantial evidence that showed Iza to be "C" who communicated over Telegram to his co-conspirators during the criminal conduct in August 2024. *See* Doc. 279 (2nd addendum). Among the most telling evidence is the content and chronology of the two Telegram chats that were going on simultaneously between "Kusha" (whom Iza has admitted was he) and "Joe Joe" from St. Louis, and between "C" (whom the evidence shows to be Iza) and "QStar Legend" (Angel Borrero). On August 23, 2024, Borrero followed Veer Chetal's parents and tracked their location while the St. Louis conspirators stalked the Chetals' residence and sought the opportunity to force their way inside. Time and again, information, photographs, locations, and intel that were provided by Borrero to "C" over Telegram were immediately repeated or transmitted by "Kusha" to the group from St. Louis. The timing and close similarity of the content of the chats demonstrate that "C" and "Kusha" are one and the same. See portions of these chats below.

**Chronology of Communications of "C" and "Kusha" (8/23/2024)**

| ***"C" [Adam Iza] and "QStar Legend" [Borrero]*** | ***"Kusha" [Adam Iza] and "Joe Joe" [St. Louis group]*** |
|---|---|

12:13:02 PM

- QStar*: It's leaving now*
- C*: The lambo? It's leaving?*
- QStar*: His parents*
- C*: Follow it*

12:19:11 PM

- QStar*: Old asf [as f**k]*
- C*: Stay on them*

12:35:44 PM

- QStar*: I swear to god if you would told me hurt them I would rn [right now]*
- C*: We were gonna throw em in that van. But that's last resort*

1:10:07 PM

- QStar*: **We 12 away** [sending photo]*
- C: *ok*

1:10:47 PM

- Kusha: ***the parents are 12 mins away*** *from the house. Maybe wait for them to open the door and rush in*
- Joe Joe: *8 minutes away*
- Kusha: *ok*

1:12:17 PM

- C: *lmk if they on the way home tho cuz well rush em and get in*

1:15:15 PM

- C: ***they on the way to the house rn?***
- QStar: ***Nah***
- C: *ok stay on em*

1:16:02 PM

- Kusha: ***they not going home yet***

1:21:42 PM

- QStar: ***[sends parents' location to C]***

1:21:42 PM

- Kusha: ***they 15-20 mins away***

1:24:59 PM

- Kusha: ***yall knock and he didnt open?***
- Joe Joe: ***Didn't answer***

1:25:14 PM

- Joe Joe: *I kept knocking*
- Kusha: ***just wait for parents to come back and then rush him***

1:26:01 PM

- Joe Joe: *Let me know when he headed here*

1:27:18 PM

- Kusha: *ok* ***just wait for parents to come back***

1:27:33 PM

- C: *stay on em* ***he didn't open door, Gonna wait for parents to come back and rush him***

1:28:59 PM

- QStar*: **They going home now***

1:29:26 PM

- Kusha*: **they on the way home now** – get ready*

1:32:33 PM

- C*: **they going home?***
- QStar*: **Nah***

1:33:56 PM

- Kusha**:** ***they still driving around***
- Joe Joe*: **So they are not headed home?***
- Kusha*: **not yet***

1:34:16 PM

- Kusha*: **tbh might be better to just grab them**. They're in open areas*
  ***[sending photos taken by QStar, a/k/a Borrero, of Chetal's father and location of Lamborghini he was driving]***

1:36:18 PM

- Joe Joe*: Where they at?*
- Kusha: *ill send you their location. Take the van plates off*

1:36:54 PM

- C***: we just gonna grab em**. Send me the address*
- QStar: *Grab Who*
- C*: the parents*

1:43:11 PM

- QStar*: **I think they're headed home rn***
  ***There old as fuck**, and they already stopped in five places*

1:43:25 PM

- Kusha*: **they might be on the way home.** ill keep you updated*

1:44:41 PM

- QStar: ***[Sends location]***

1:44:52 PM

- Kusha: ***yea they on the way*** *– get ready youll see the urus*

1:45:38 PM

- Kusha: ***just knock out the parents – they old as fuck***
- Joe Joe: *Ok*

1:55:38 PM

- QStar: ***2:00 pm ETA***

1:55:45 PM

- Kusha: ***2pm***

1:57:40 PM

- Joe Joe: *Tell him [boy in the car]* ***look out for cops or ppl***

1:57:58 PM

- C: *so they 2 mins away? when you get there* ***Just be on the look out for cops or people***

2:03:33 PM

- C: *wheres the urus*
- QStar: *Home*
- C: *is the urus in a garage or outside – in clear view*
- QStar: ***Outside In clear view***

2:03:39 PM

- Kusha: ***its outside***

2:04:16 PM

- Kusha: *I see it* ***in clear view***

2:19:43 PM

- C: *can you go to the van and since they didnt taken the plates off yet* ***can you switch with them take the van*** *and park somewhere else*

2:21:08 PM

- C: *yea go right now cuz they gonna do it rn*

2:21:27 PM

- Kusha: *where yall at – **hes coming with the car to take the van***

2:57:31 PM

- C: *. . . send me the address so they can be on the way there*
- QStar: ***67 Newtown Rd Danbury, CT 06810 United States***

2:58:13 PM

- Kusha: ***67 Newtown Rd Danbury, CT 06810 United States***

3:02:25 PM

- C: *the boys on the way there **strategize with em***

3:03:17 PM

- Kusha: *. . . the dude coming – **He'll help you strategize***

3:12:39 PM

- *QStar: **Tell them meet me by Verizon it got zero camera behind it same plaza as Walmart***

3:13:18 PM

- Kusha: ***Tell them meet me by Verizon it got zero camera behind it same plaza as Walmart***

3:40:48 PM

- C: ***you by verizon***
- QStar: ***Yeah***

3:40:58 PM

- Joe Joe: *Not seeing Verizon*
- Kusha: ***hes by verizon he just hit me***

3:41:23 PM

- C: *wheres verizon – they asking*
- QStar: *Want addy*
- C: *yes*
- QStar: ***67 Newtown Rd Danbury, CT 06810 United States***

3:42:34 PM

- Kusha: ***67 Newtown Rd***
  ***Danbury, CT 06810***
  ***United States***

3:48:52 PM

- Kusha: *ok did you talk to the nissan guy yet*
- Joe Joe: *Yea I'm in Nissan*

3:53:28 PM

- QStar: ***Want me to tell you when I swapped the plates***
- C: *yes*

3:54:37 PM

- Kusha: ***my guy swapping plates rn*** *in the van*
  *hes gonna be there to help yall too*

4:08:22 PM

- Kusha: *he said yall are leaving?*

4:10:30 PM

- Kusha: *??*
- Voice call missed

4:12:38 PM

- Voice call missed

4:30:17 PM

- C: *if you wanna help run in there*
  *we can arrange it*
- QStar: ***Tbh it's up to you too I'm down idgaf***
- C: ***ok be on standby***

4:47:39 PM

- Kusha: *Can you guys drop off the Nissan – I'll have your tickets booked for you*

4:52:00 PM

- C: *switch the van with the honda*
  *so you can go watch the place*
  *we need to verify which unit is 100%*
  *before we do anything*
  *it should be #4 but cant risk it*
  *ill take care of your expenses n time*
- QStar: *Alright then sayless where they at*
- C: *send ur address hell come by*

4:55:40 PM

- C*: im gonna fly out other people too*
  *we're gonna assemble a whole army*
  *If it goes right we'll break off $100k each guy*
  *yourself included*

4:58:30 PM

- C*: ask around, we dont fuck around lol*
- QStar: *Nah ik me either also I got someone who is down to come and he's been on missions with me already. Solid n***a*
- C: *Alright we'll get him too and anyone else*
  *You think is good for it*
  *Here's what i expect moving forward*
  *everything on this job including this convo*
  *stays here regardless of who asks*
- QStar: *Always*

5:11:33 PM

- Kusha*: **my boy that you met – hes on game** and did this shit a lot of times*
  *I just had $1000 sent your way – now tell me if we're doing this or not*
  *ill throw $50k for each guy after we're good*

5:13:43 PM

- C: *my guy is there to switch with you*
- QStar*: Omw*

Disregarding entirely the timing and obvious similarity in content between the C/Kusha chats, indicative of the same person being both, Iza attempts to substantially downplay the other evidence that links him and his phone to the Telegram chats with Borrero and Diaz, by both ignoring and mischaracterizing the evidence. The full content of the chats with "C" was found on phones used by Borrero and Diaz that were seized and extracted directly after the two were apprehended by police. They had no opportunity to delete the chats they had with Iza, a/k/a "C," before law enforcement took their phones. Iza's phone, on the other hand, was not taken from him until his California arrest on unrelated charges a month after the high-profile arrest of Borrero and Diaz, giving him the opportunity Borrero and Diaz lacked to delete his chats with them. Moreover, while the content of the chats was not found on Iza's phone, ample evidence of

the fact of his communications with both Borrero and Diaz was. Literally hundreds of artifacts showing contacts between August 23 and 25, 2024 with Borrero and Diaz were found on the phone taken from Iza's person when he was arrested. These artifacts would not have been found on the phone if the phone had not been in contact with the Telegram accounts used by Borrero and Diaz.[3]

Moreover, the evidence on Iza's phone concerning communications with Borrero and Diaz over Telegram is consistent with the Telegram chats found on their phones with "C." All the evidence is dated between August 23 and 25, 2024, the dates when Borrero and Diaz were in Connecticut and acting under Iza's direction. And the timing of the interactions that were found on Iza's phone matches that found on the phones seized from Borrero and Diaz.[4] In addition, photographs and video sent by Borrero over Telegram to "C" were found on Iza's phone. Several of these were forwarded to "Joe Joe" by Kusha, whom Iza admits was he.

Further, Iza used the Telegram moniker "C" for other chats, beyond those with the Miami conspirators in this case. Data from his phone showed that he used that display name in chats with his former girlfriend Iris Au. His Telegram chats with one of the corrupt LA Sheriff's deputies he employed, Eric "Chase" Saavedra, his California co-defendant, was on the same Telegram account as that shown for "C." In addition, the Telegram user ID number for "C" is the

[3] One of these artifacts was a screenshot of part of the Telegram chat between "C" and "Strikerworld" (Diaz), something mentioned by Iza with the suggestion that it was sent to him by someone else. Springboard, the location where the screenshot was found on Iza's phone, is the location where screenshots taken by the device are saved, which is a different location than the device's cache files where images sent to a device are saved. (According to FBI CART examiners). Further, the metadata of the screenshot shows that it was saved on Iza's phone within a second of the screenshot being taken. In other words, the screenshot was taken by Iza's phone of a chat actually on Iza's phone and not of a chat from a different phone that was then sent to him –the screenshot could not have been saved so quickly if that were the case.

[4] Iza tries to make much of the fact that not every single chat between C and Borreo and Diaz is reflected in Iza's phone data. There are several potential reasons for this, including his possible use of several different devices to conduct the chats, or his deletion, physically or automatically, of chats over Telegram on his phone after the arrests of Borrero and Diaz. Regardless, the evidence that was on his phone showed substantial contact with QStar Legend and Strikerworld during the relevant period, evidence that can only be explained by contact between Iza's phone and those of Borrero and Diaz.

same as that used for other display names used by Iza, including "HTP," "Z," "Adam Zort," and "Zort.com." One Telegram user ID can have multiple display names, a practice Iza employed here. And multiple witnesses identified "C" as a display name used by Iza on Telegram. Accordingly, the links between Iza and Telegram display name "C" are many.

Iza's other approach, to baldly claim that "C" was actually Cameron Cureton who used the moniker "CX," likely arose from references in certain FBI 302s that the person directing the kidnappers may have used "Cam" as an alias. The single source for that suggestion also indicated, however, that "Cam" was believed to be someone named "Adam" who owned the crypto trading bot called "Zort," lived in a Bel Air mansion with a bowling alley, had corrupt police officers working for him, and was an associate of James Schwab, all indications that Iza was "C." *See* Sealed Exhibit 1.[5] Iza tries to force these same circumstances onto Cureton, but his "proof" of Cureton's involvement in the Danbury conspiracy is anything but.

First, he asserts that Cureton and James Schwab are associated and that the two traveled together to Miami in July 2024, when, presumably, Schwab and Veer Chetal came into conflict. His support is an affidavit from Iza associate Milad Sawari and a photograph from an Instagram account for "cx." In the affidavit, Sawari states that James Schwab introduced Sawari and Cam, that he (Sawari) and Cam lived together in late 2024,[6] that Cam used the moniker "CX" on Telegram, that he stole cryptocurrency, and that he "worked with a rogue LA cop" named "Erik Haleim." Sawari's affidavit does NOT say that Cameron Cureton ever used the moniker "C" on Telegram, that Cureton lived or committed crimes with Schwab, that the two traveled together at

---

[5] Agents investigated Cameron Cureton to determine if he had any involvement in the Danbury conspiracy but did not find evidence of his involvement.

[6] Iza asserts that Cureton and Schwab were roommates, but nothing he submitted supports that claim and the evidence obtained in the investigation is to the contrary. In 2024 up to the time of his arrest in late January 2025, Schwab was living with Remington Ogletree and Daniil Benzidi, a/k/a "Judah." The evidence shows that Benzidi was with Schwab at Vendome on the night Schwab and Chetal interacted in early July 2024, and that Schwab alerted Ogletree in chat messages the Government obtained about the conflict as it was occurring.

any point, including to Miami in July 2024 when Schwab fought with Chetal, or that he knew Cureton had any involvement whatsoever in the crimes committed in this case. The photograph from Instagram submitted by Iza to show that Cureton and Schwab traveled together to Miami in July 2024 simply shows three people with their faces completely covered in front of a plane – while some unnamed person wrote in marker the words "Cam" and "Schwab" on the photograph, there is no date, location, or metadata to show when and where this photo was taken. Agents have interviewed a number of people who were either at Vendome (the Miami nightclub) when the fight between Schwab's group and Chetal's arose or communicated about it shortly afterward in chats obtained by agents. No one identified Cameron Cureton, a/k/a "CX," as having been there. And even if he were, that does not prove he had any involvement in the crimes in this case.

As noted, Sawari's affidavit does not support the claim Iza is making here. Moreover, Sawari has a long history with Iza and has evaded service of a subpoena during this investigation for months. He has spoken to Special Agent Loucks by phone, and he wanted to talk only about the home invasion robbery that was committed against him, Cameron Cureton, and another associate by ex-LA police officer Eric Halem in December 2024, the officer Sawari claimed in his affidavit provided Cureton protection. *See* Sealed Exhibit 2. In reality, Halem has been off the police force since 2022 or 2023 and was recently sentenced to life imprisonment for a home invasion robbery he perpetrated in December 2024. *See* https://www.latimes.com/california/story/2026-08-04/former-lapd-officer-crypto-robbery-prison-sentence. When Special Agent Loucks told Sawari that he wanted to ask about the Danbury kidnapping, Sawari responded that he assumed Special Agent Loucks wanted to discuss James Schwab and Adam Iza. Sawari did not want to talk about Iza, asserting that he was trying to put his relationship with Iza in the past. At

no time did Sawari state or even suggest to Special Agent Loucks that Cureton was involved in the Chetal robbery/kidnapping, or any criminal activity with Iza, contrary to the claim Iza is making now.

Iza also submitted to the Court IC3 complaints concerning a theft of Bitcoin in June 2024. Defense Exhibits F & G. The original complaint, Exhibit F, notes that the victim talked to three unknown males during the scam. The updated report, Exhibit G, includes a description of a communication an unnamed person had with the victim after-the-fact, informing him that the person who scammed him went by "Cam" and "CX" and lived in Beverly Hills. The person who contacted the victim was not named, and there was no indication how that person obtained information about the scam, why he or she chose to impart this information, and whether it was accurate. In any event, these complaints have no relevance to the instant case. Presumably, Iza included them to suggest that "Cam" was involved in the theft of Bitcoin, but the complaints do not even prove that, much less show any connection between the scammers of that victim and those involved in the Danbury conspiracy.[7]

The most outrageous assertion Iza makes to this Court – in his effort to put the blame on Cureton by pinning him as Telegram user "C"-- is his claim that Cureton participated in group chats over Telegram with Iza concerning the Facebook advertising scam that underlies crimes charged against Iza in California, with Cureton using the "C" Telegram account. Defense Exhibits I & J. The group chat from which these exhibits were pulled was found in Iza's phone. See Gov. Exhibit A (full chat). There are four participants: the alien emoji Telegram account

[7] Similarly, Defense Exhibit O, an apparent snip from a post by ZachXBT, provides nothing relevant. In response to someone posting about dangers experienced by tech entrepreneurs in Dubai at the hands of the government, ZachXBT identified those in Dubai who were believed to have been involved in criminal activity. He included Cameron Cureton on the list as a participant in social engineering and violent robberies. ZachXBT may be right about Cureton, but nothing in this post suggests much less proves he was involved in the crimes charged here.

which Iza identifies to this Court as his own, the 6561470120 account (the "C" account) which Iza now tries to claim is Cameron Cureton, an account with the display name "FB," and another with the name "Itoshi." Iza's alien account created the group chat and the 656 "C" account joined just 17 seconds later. Iza, as the alien emoji, identified the user of the 656 account in the chat as "htp," a moniker Iza was known by associates to use on Telegram, and thereafter, the 656 account led the detailed discussion about how Facebook ad accounts would be handled. The 656 account and Itoshi go back and forth; "FB" never participated at all in the chat chain, and the alien emoji account, the one identified by Iza as his, participated only infrequently and not particularly substantively. The reality is that Iza did in this group chat what he was known to do in others – operated multiple Telegram accounts within a group chat to make him and his business ventures appear more legitimate.[8]

So, to try to distance himself from the "C" account on Telegram in this case, Iza attempts to put Cureton in the middle of Iza's Facebook scam as an integral player, making representations to this Court that are patently false. [redacted] The prosecutor in the Central District of California [redacted] was aware of Cureton as a victim of attempted robbery by ex-LAPD officer Eric Halem but had no information, [redacted], to support the claim that Cureton was Iza's associate in the Facebook scheme or in any other. [redacted]

[8]Another example was found on Iza's phone, a Telegram group chat involving the 656 account, an account with Kusha as the user name and accounts in the names "Jd," "J," "MM," and "ecom cashback." *See* Gov. Exhibit B. This time the user of the 656 account was referred to as "Z," another moniker known to be used by Iza (*see, e.g.,* Government responses to Iza's objections; Iza referred to himself as "Zee" when calling Remington Ogletree on the contraband phone in prison) rather than "htp." In the group chat, "Kusha" or "Kush" is referred to as "Z's" assistant.

[redacted]. None of the many witnesses agents have talked to during this investigation ever identified Cameron Cureton as an associate of Adam Iza. [redacted] Further, no evidence supports the assertion that Cameron Cureton used the 656 Telegram account at any time, and certainly not during the robbery/extortion/kidnapping scheme perpetrated by Iza, Schwab, and their co-conspirators. That account was used by Iza to contact his girlfriend Iris Au, it was used by Iza to chat with his California co-defendant Chase Saavedra, and it was used by Iza to direct Angel Borrero and Reynaldo Diaz when they were in Connecticut from August 23 through August 25, 2024, participating in a conspiracy that involved not only Iza but also Iza's brother. Iza's phone is full of data linking him to the "C" Telegram account. Nothing links Cureton to that account except Iza's bald and false assertion in his sentencing memorandum.[9]

## IV. ARGUMENT

As the Court is well aware, 18 U.S.C. § 3553(a) provides that "[t]he court, in determining the particular sentence to be imposed, shall consider":

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

[9] Iza's submission of this materially false information constitutes obstruction under U.S.S.G. § 3C1.1.

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

The Government addresses the weight of these factors below.

**A. <u>Providing Just Punishment -- The Nature, Circumstances and Seriousness of the Offense and the Defendant's History</u>**

By now, this Court is well aware of the heinous, exceedingly violent nature of the crime in this case. The Chetal family were surveilled and literally stalked for several days as the perpetrators sought the opportune moment to strike at them. The plan always anticipated violence from every angle—whether it involved a home invasion where the parents and their son were assaulted and restrained inside their residence, or the violent abduction of the parents away from home to force their son to disgorge millions in stolen cryptocurrency to those who were greedily seeking what was never theirs. From the beginning, the conspirators intended to use weapons and restraints-- air rifles, metal bats, zip ties, duct tape. And, when they did take action against the victims, they employed extreme physical violence and inflicted severe bodily and emotional trauma. Everything about this case shows an utter contempt for the constraints of the law and the norms of society, and a callous disregard for the safety and well-being of other people.

Adam Iza and James Schwab are at the top of the pyramid of the conspirators in this case. As the instigators of the plot and the directors of the action, they are without

doubt the most culpable. They determined what would be done, recruited others to do as they ordered, paid the expenses, gave the commands, and stood to gain the most. If this crime had been successfully completed, Iza and Schwab would have garnered millions in cryptocurrency while paying their subordinates thousands of dollars at most. They set everything into motion and let the others take the risk for them.

The evidence shows Iza to be a cold and calculating manipulator, callously ordering the crews on the ground to "knock out" the parents, whom he described as "old as f**k," and to "do what you gotta do." PSR at 15, ¶ 46. When he gave direction about how Veer Chetal should be handled, he told his underlings to hit him hard enough to cause "brain damage" after Chetal had given them access to the millions in Bitcoin. PSR at 16-17, ¶¶ 54, 57. It was Iza who directed Borrero to get metal bats and zip ties, obviously intending violence and forcible restraint. *Id.* at ¶ 55. When Diaz informed him that he had the parents in his sights, Iza urged him "LETS GOOO," and then pressed Borrero, "parents are out – lets do this." *Id.* at 18, ¶ 62. Armed with metal bats and their fists and feet, they did as Iza ordered, crashing into the parents' SUV, dragging them into the street, beating the father mercilessly, pulling the mother by her hair to the cargo van, throwing them both into the back, continuing to beat the father once in the van, and binding them both with duct tape, all the while threatening to kill them because of their son. And all this was orchestrated and directed by Adam Iza and James Schwab.

With the others in the conspiracy, Iza was authoritative and menacing. Saif Faiq, Iza's brother, warned his St. Louis associates that, while Iza, a/k/a "the dude," would pay for their services, he would also retaliate against anyone who crossed him, explaining that he had their personal information and could send people after them if they backed out. PSR

at 16, ¶ 51. With Borrero and Diaz, Iza also was explicitly threatening, telling Borrero that, if he or his associates chose to "f**k around," they should know that he and his guys were "easy on the trigger," and that this "ain't [their] first rodeo." *Id.* at ¶ 53. When Reynaldo Diaz asked how the cryptocurrency would be handled, Iza put him in his place, issuing an implied warning – "We handle all that . . . We take care of people well as long as you don't ask questions that don't need to be asked." *Id.* at 17, ¶ 56.

Anyone unfamiliar with Iza's history might dismiss his words as empty posturing, but he has shown himself quite ready to use violence, force, intimidation, and threats to get what he wants. Obviously, his case in California involved numerous instances of him extorting money and cryptocurrency from people at gunpoint or through intimidation and threats, employing corrupt law enforcement officers to obtain search warrants under false pretenses for his benefit and to set up someone who angered him for illegal arrest on drug charges. He arranged for home invasions and armed robberies and sought information from confidential law enforcement databases for his own gain. *See United States of America v. Adam Iza, a/k/a "The Godfather, et al.,"* 2:24-CR-00630(A)-PA, Doc. 107 (Amended First Superseding Information).

Beyond the California case, however, the agents discovered other evidence of Iza's readiness to employ crime and violence out of avarice. He used his connection to Austin Fine, who laundered stolen cryptocurrency, to track who had cryptocurrency Iza could steal, exploiting his financial connection to corrupt sheriff's deputies to find the targets' devices. When Malone Lam, a renowned crypto scammer, was spending millions through Fine, Iza told a deputy whom he paid for security services to have someone "jump in [Lam's] shit when he's at the club and grab his computer," which would give them "10-

20m" in crypto. Iza thought there was little risk involved – "He can't call the cops or do anything at all." PSR at 9, ¶ 22. When Iza received word of the $240+ million Bitcoin theft in August 2024, he immediately began orchestrating a way to get as much of it as he could. Obviously, he set out to steal Veer Chetal's share. But he also reached out to an associate in California, informing him that he knew the five "kids" who had stolen the Bitcoin and had a strategy to obtain it. That strategy included kidnapping – "Might have to kidnap him tbh," but Iza did not want anything to "lead back to [him]." *Id.* at 11, ¶ 31. These are examples, but the agents uncovered more that revealed Iza to be ruthless, malevolent, unprincipled, and greedy.

In seeking a lesser sentence, Iza describes a difficult childhood, and he may have had one. But his history also shows involvement in cybercrime from his mid-teens, use of violence and intimidation as a very young man, and no record of legitimate employment of any kind. Further, Iza has done his best to foster a reputation as a criminal kingpin. His associates described him as "the Godfather," an alias he enjoyed, and noted his efforts to control those around him. In that vein, he texted Remington Ogletree, as the news of the arrests of Malone Lam and Jeandiel Serrano for the Bitcoin heist broke, "Want to see something funny as f**k – do not leak this. I love that my name is not anywhere on this yet I control all the chess pieces."[10] PSR at 23, ¶ 83. He told Veer Chetal that Schwab wanted Iza to have Chetal killed after their altercation in Miami in July 2024, *id.* at 24, ¶ 86, advised Schwab to flee before he was arrested, *id.* at ¶ 88, and got word to Austin Fine from prison that he was likely to be charged and should take steps to have an associate delete Telegram chats. *Id.*

[10] Iza reached out to both Lam and Chetal and offered to facilitate their escape.

While Iza claims to have profoundly changed since his incarceration, his own words in prison tell a different story. Referring to himself in prison calls as the "Godfather of Bel Air," he explained that, once released, he intended to alert the media and go to "skid row" to hand out turkeys and chickens like the protagonist of the movie "American Gangster." He bragged that he was the most high-profile person at Wyatt and thought he belonged at MDC Brooklyn because Wyatt was a "joke." When told he rivaled Osama bin Laden in fame as a Middle Eastern man, Iza thanked the person talking to him, telling her, "That's a compliment." Expressing confidence that he would be pardoned in the California case (describing the "LA shit as a piece of cake"), he noted that he had to get through the case in Connecticut and claimed that people in the White House were receptive to a pardon. In short, he has given no indication of any profound change or true desire to reverse course. If anything, his efforts to manipulate the system continue.

One of the most important considerations in this case is just punishment for the defendant's crimes. 18 U.S.C. § 3553(a)(2)(A). The scheme Iza and Schwab set into motion took place over several days. Throughout the plot's duration, Iza was pushing, insisting, inducing, and doing everything possible to ensure that this violent enterprise was successful. His efforts led directly to the brutal attack on a middle-aged couple who have suffered truly devastating fallout as a result. They were physically injured, of course, but they've suffered far more than that. One victim lost his job, and both lost their visas. While they are hopeful they may be allowed to remain, they still face an uncertain future despite living in this country for two decades. Emotionally, they have not recovered and may never be whole again. The need to justly punish this brazen and horrific crime and the defendant's eager instigation and participation in it weigh heavily in favor of a very significant

sentence. The defendant asks this Court for a two-year sentence. The Government submits that such a sentence does not even come close to just punishment for this defendant.

The defendant makes a strange argument without any legal support that he should receive credit toward his sentence since the date his co-defendant James Schwab was indicted. He does not indicate why this is appropriate, and the Government is not aware of any reason why he should receive credit beyond what the Bureau of Prisons will determine after the sentence has been imposed by the Court. The defendant has been in custody for the case from the Central District of California, on serious charges unrelated to the ones pending here, since his arrest in September 2024. He has pled guilty there and is awaiting sentencing.

Under 18 U.S.C. § 3584(a), multiple terms of imprisonment imposed at different times will run consecutively unless ordered to run concurrently. Particularly given that the defendant has two separate federal cases for crimes that are unrelated to each other (*i.e.*, neither would be considered "relevant conduct" for the other), a consecutive sentence is appropriate here. *See* 18 U.S.C. § 3584(b) (a determination of consecutive vs. concurrent sentences should be based on the factors set forth in 18 U.S.C. § 3553(a)). However, the determination of whether the sentence in this case will be consecutive or concurrent to the sentence imposed in the California case will be determined by the California judge who will sentence the defendant after this Court imposes sentence. *See United States v. Almonte-Reyes*, 814 F.3d 24, 28-29 (1st Cir. 2016); *United States v. Obey*, 790 F.3d 545, 548-50 (4th Cir. 2015) (the most recent judgment determines how sentences are to run).

According to the Bureau of Prisons, the entity responsible for determining credit for time already served, the sentence in this case will be aggregated with the one imposed

in California, and the defendant will receive credit towards that aggregated sentence for all time spent in federal custody. *See* 18 U.S.C. § 3584(c) (multiple sentences are aggregated and treated as one for administrative purposes). If the California judge imposes a concurrent sentence, the defendant will receive credit towards his Connecticut sentence since his initial incarceration in September 2024, even though the two crimes are distinct from each other.

The Government submits that the crimes the defendant committed in California and the ones he committed here are exceedingly serious in their nature, circumstances, repercussions, and harm. They evince the defendant's complete lack of respect for the law, his willingness to manipulate the justice system for his own ends, his antipathy towards others, his eager employment of violence and intimidation, and his consuming greed. Whatever aggregate sentence he receives should account for all those circumstances.

B. The Need to Promote Respect for the Law, to Provide Adequate Deterrence, and to Protect the Public

Each of these factors weighs heavily in favor of a sentence within the Guideline range as calculated by the Government. This case has garnered much publicity, and violence like that in this case appears to be a feature of the criminal cryptocurrency community. Victims like the ones here are seen as easy targets, given that they cannot readily summon law enforcement. The financial rewards are believed to be quite high, and the prospect of substantial reward exponentially increases the risk of violence. A significant sentence of imprisonment would show that the consequences of engaging in this type of criminal activity are severe. The sentence here will serve as a much-needed wakeup call, not only to the defendants in this case but to others who are monitoring it. And many people are monitoring what happens in this case.

Thus, the objectives of deterrence and of protecting the public are best served by a sentence commensurate with the crimes here. Moreover, as noted above, the defendant has shown little respect for the law to date. The sentence imposed in this case should account for that.

Accordingly, the Government submits that the need for specific and general deterrence, to promote respect for the law, and to protect the public from future crime weigh strongly in favor of a sentence within the Guideline range as calculated by the Government.

C. The Need to Avoid Disparate Sentences

Courts seek to avoid nationwide sentencing disparities for similar crimes and similar criminals. *United States v. Saez,* 444 F.3d 15, 18 & n. 2 (1st Cir. 2006) (citing cases). Defendants similarly situated to this defendant – having committed a violent kidnapping and carjacking, causing serious injury and lasting distress -- should and would be facing substantial prison sentences, consistent with the applicable Guidelines range. Furthermore, while this consideration pertains primarily to defendants nationwide, as noted above, the defendant and James Schwab are the most culpable conspirators in this case. The sentence imposed here should account for the fact that the others who have pled and been sentenced in the related case were acting under the orders and direction of Adam Iza and Schwab, who stood to gain the most from the crime.

CONCLUSION

For the foregoing reasons, the Government respectfully submits that the facts of this case, the circumstances of this defendant, the sentencing factors set forth in 18 U.S.C. § 3553(a), and the law governing sentencing all fully support a sentence of imprisonment as calculated by the Government.

Respectfully submitted,

DAVID X. SULLIVAN
UNITED STATES ATTORNEY

/s/

KAREN L. PECK
ASSISTANT U.S. ATTORNEY
Fed Bar No. CT14959
1000 Lafayette Blvd, 10th Floor
Bridgeport, CT 06604
(203) 696-3000
Karen.Peck@usdoj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 2, 2026, a copy of the foregoing Government's Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

__________//s//_________
KAREN L. PECK
ASSISTANT UNITED STATES ATTORNEY