UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | 3:25CR30(SVN) |
| SAIF FAIQ | : | October 21, 2026 |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The defendant, Saif Faiq, was one of the coordinators and directors of the crime in this case, and other than his co-conspirators Adam Iza and James Schwab, expected to profit more than the other participants. From the beginning, he was active in recruiting others; he wanted to monitor and control their actions but insulate himself. He kept his name off rental paperwork for the residence and vehicles the conspirators used. He sent others out to buy supplies and in to strongarm the target to disgorge himself of millions in Bitcoin. Faiq kept watch over those who were supposed to follow his and his brother's lead. And he urged them to commit violence, including the abduction of the target's parents, so that he could profit, willingly subjecting them to a risk he would not accept himself. When they balked at a kidnapping on a public street, Faiq sought, through persuasion and coercion, to change their minds. He embraced the use of violence by others to achieve the goal of obtaining millions in stolen cryptocurrency.

Simply put, the range set forth in the Presentence Report does not reflect the seriousness of the defendant's crime, the interests of justice, or the goals a federal sentence is supposed to achieve. For that reason, the Government seeks a sentence consistent with the Government's position in the plea agreement.

## I. PROCEDURAL BACKGROUND

On October 28, 2025, a federal grand jury returned a superseding indictment against Saif Faiq and others, charging Faiq in Count One with Conspiracy to Commit Hobbs Act Robbery, in

violation of 18 U.S.C. § 1951(a), and in Count Two with Conspiracy to Commit Kidnapping, in violation of 18 U.S.C. § 1201(c). Doc. 132. Faiq was arrested in St. Louis on November 12, 2025 and was presented before a magistrate there who ordered him detained. Doc. 133. He was presented before Magistrate S. Dave Vatti on January 7, 2026 shortly after his arrival in this District. Doc. 160. On June 8, 2026, Faiq entered a guilty plea pursuant to a plea agreement. Doc. 211, 215. The Probation Office prepared and filed a draft Presentence Report on September 15, 2026, Doc. 315, to which the parties submitted objections. Thereafter, the final Presentence Report was filed. Doc. 319. The defendant has filed a sentencing memorandum, suggesting to the Court that he be sentenced to time served. Doc. 321. As stated more fully herein, the Government believes such a sentence is contrary to the sentencing factors set forth in 18 U.S.C. § 3553(a) and would not serve the goals of sentencing or the interests of justice. The crime the defendant committed is exceedingly serious and merits a substantial sentence of imprisonment, beyond not only the sentence Faiq seeks but also the range set forth in the Presentence Report as calculated by the Probation Office.

## II. THE GUIDELINES CALCULATION

***The Plea Agreement***

The parties did not agree to the calculation of the sentencing range under the Guidelines. The Government's position is that, given the defendant's agreement to and actions in furtherance of the violent abduction of V.C.'s parents as part of the plan to force his turnover of the stolen Bitcoin, the kidnapping, injury, and the use weapons in furtherance of the abduction were "within the scope of, in furtherance of, and reasonably foreseeable in connection with" the conspiracy in which he participated. U.S.S.G. § 1B1.3(a)(1)(B). Accordingly, the Government's calculation of the Guidelines included the enhancements provided in the Hobbs Act robbery

section for abduction (§ 2B3.1(b)(4)(A)), the victims' serious injury (§ 2B3.1(b)(3)), and the use of weapons (§ 2B3.1(b)(2)(D)) as part of that criminal activity. With those enhancements and awarding full credit for acceptance of responsibility, the total offense level is 29. Doc. 215 at 4-5. The defendant did not agree to the enhancements, so the plea agreement included his alternative position on the total offense level, that is, 17 with three levels of credit for acceptance of responsibility. *Id.* Obviously, the parties had vastly different positions on how the Guidelines should apply here.[1]

***The Presentence Report***

The Presentence Report ("PSR"), included a calculation different from that of each party, adding a three-level role enhancement under U.S.S.G. § 3B1.1(b) for the defendant's role as a manager or supervisor of a criminal activity with at least five participants. PSR at 26, ¶ 97. The role enhancement is supported by the evidence of the defendant's recruitment of conspirators, *see id.* at 9, ¶ 27, and the management and direction he provided the other participants before and during their time in Connecticut, *id.* at 10-16, ¶¶ 30, 35-38, 51-52. With that enhancement, the PSR calculated the total offense level, after credit for acceptance of responsibility, as 20. *Id.* at ¶ 103.

***The Defendant's Responsibility for the Enhancements in the Plea Agreement***

Under U.S.S.G. § 1B1.3, the defendant is held accountable for all acts and omissions within the scope of, in furtherance of, and reasonably foreseeable in connection with all jointly undertaken criminal activity and "all harm that was the object of such acts and omissions."

[1] Consequently, the defense's suggestion that a *Fernendez* departure is in order because the Probation Office did not calculate the Guidelines range in accord with the Government's position is off base. The parties had *no* agreement about the application of the Guidelines so there is no agreement to effectuate through a departure. Further, the parties reserved their rights to respond to any alternative calculations proposed by the Probation Office, which would include application of the enhancement for a role in the offense. Doc. 215, p. 5.

U.S.S.G. § 1B1.3(a)(1)(B) and (a)(3). The scope of the agreement between the conspirators here, including Faiq, was to obtain the stolen Bitcoin in V.C.'s possession by force. The abduction of his parents, their restraint, and the substantial physical injury to them was in furtherance of the conspirators' goals and certainly was reasonably foreseeable to Faiq. Indeed, the group had talked repeatedly and explicitly about grabbing V.C.'s parents and throwing them in the van, knocking them out, and holding them for ransom when Faiq was in Connecticut conducting surveillance and discussing the plans. Iza, who was communicating with Faiq, with the others from St. Louis, and with Angel Borrero, instructed Borrero, who was following the parents, to send the address of their current location because "we [the St. Louis conspirators] just gonna grab em . . . throw them in the van." PSR at 15, ¶¶ 45-46. When Borrero gave Iza the heads up that the parents were heading home, Iza put out the word to the St. Louis group, "Lets fucking do this . . . you need to find his room where the computer is – just knock out the parents, they old as fuck." *Id.* at ¶ 47. Iza instructed Borrero to get the van and steal tags to replace the license plates before they grabbed the parents, and Borrero did so along with procuring "duct tape n all," as he informed Iza. PSR at 16, ¶ 50. Iza's plan was for Borrero to assist the St. Louis crew, and he told them over Telegram that Borrero would help them "strategize" and would "be there to help yall too." *See id.* at 16, ¶ 50. He pushed the St. Louis guys to complete the job with Borrero's help: "ill throw 50k for each guy after we're good." *Id.* at ¶ 51.

When others eventually balked at these actions, Faiq tried by carrot and stick to persuade them to follow through with the plan as directed. He assured them that "the dude," that is, co-conspirator (and Faiq's brother) Adam Iza, was good for the money he promised if they went ahead with the kidnapping plan. PSR at 16, ¶ 52. And he also warned them not to cross Iza, as he

had their personal information and could take action against them if they failed to deliver. *Id.*[2] He remained in Connecticut after the others returned to St. Louis and coordinated the exchange of vehicles with Angel Borrero who was continuing on with the plan as agreed. *Id.* at ¶ 53. Those vehicles, including the Honda Civic Faiq had his compatriots rent and the van they had intended to use to transport V.C.'s parents, were used in the eventual assault and abduction. Borrero and other conspirators took the actions that were contemplated by Iza and Faiq in order to effectuate the object of the conspiracy, the forcible taking of the stolen Bitcoin from V.C.

The fact that Faiq left before the abduction of V.C.'s parents does not mean he is not responsible for the actions taken by other conspirators in furtherance of the plan. "[A] defendant who has joined a conspiracy continues to violate the law through every moment of the conspiracy's existence and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot." *Smith v. United States*, 568 U.S. 106, 111 (2013) (internal citations omitted). "Passive nonparticipation in the continuing scheme is not enough to sever the meeting of the minds that constitutes conspiracy." *Id.* at 112. *See also United States v. Hargrove*, 508 F.3d 445, 449 (7th Cir. 2009) (Retiring and moving out-of-state does not disavow or defeat the conspiracy when the defendant did not take affirmative steps to defeat or disavow the conspiracy's purpose); *United States v. Mejia*, 55 F.4th 1, 10 (1st Cir. 2022) (Leaving the country, giving up customer list, and pursuing different opportunities did not constitute withdrawal from the conspiracy); *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.,* 288 F.Supp. 2d 325, 329 (E.D.N.Y. 2003) (withdrawal requires affirmative acts inconsistent with the conspiracy's object that are communicated in a manner reasonably calculated to reach co-conspirators) The acts and the harm inflicted on the victims were exactly what Faiq agreed to and

[2] He also kept their belongings in the car he was driving, trying to ensure they would not leave. Gov. Sealed Exhibit.

what he tried to coerce his St. Louis associates to perform. He was aware Borrero was part of the conspiracy and received the results of his surveillance of the parents throughout Faiq's own active participation. And he knew that Borrero was going to continue what they had started in an effort to obtain control of V.C.'s cryptocurrency. Thus, the abduction of V.C.'s parents, the use of weapons, and the serious bodily injury suffered by S.C., are within the scope and in furtherance of, and reasonably foreseeable in connection with, criminal activity jointly undertaken by Faiq and his co-conspirators. U.S.S.G. § 1B1.3(a)(1)(B). *See also United States v. Medina*, 74 F.3d 413 (2d Cir. 1996) (defendant, who masterminded the robbery of a construction company and was aware his compatriots were armed, was properly held accountable under § 1B1.3 for a weapons enhancement).

Accordingly, the Government submits that the enhancements set forth U.S.S.G. § 2B3.1 that are included in the Government's calculation of the Sentencing Guidelines should be applied here, leading to a total offense level of 29, including the three-level credit for acceptance of responsibility.

***U.S.S.G. § 2X1.1***

The defendant also argues that his offense level should be reduced by three levels under U.S.S.G. § 2X1.1(b)(2) because the group from St. Louis had not completed all acts necessary to effectuate the object of the conspiracy. In support, he claims that they could not locate V.C., that no one answered the door when they knocked, and that they did not have his correct address. As to the last assertion, the evidence shows otherwise. Iza learned the correct unit number for the victims' home from an associate of V.C. and communicated it over Telegram to the St. Louis conspirators while they were on scene.




Moreover, § 2X1.1(b)(2) does not apply here. That section provides for a three-level decrease of the offense level for a conspiracy unless a participant in the conspiracy completed all acts the conspirators believed necessary on their part for the successful completion of the substantive offense, or the circumstances show that they were about to complete all such acts but for apprehension or interruption by an event beyond their control. The "relevant question," according to the Second Circuit, is "whether the conspiracy ripened into a substantially completed offense or came close enough to fruition." *United States v. Luchtman*, 910 F.3d 33, 39 (2d Cir. 2018), (quoting *United States v. Downing*, 297 F.3d 52, 62 (2d Cir. 2002)). In *Luchtman*, the Second Circuit upheld the sentencing court's refusal to reduce the offense level under § 2X1.1(b)(2) where the defendant had initiated contact with a terrorist organization, pledged allegiance to that organization, planned an attack at a particular restaurant, and purchased weapons and supplies in preparation. His actions indicated that the conspiracy was sufficiently "ripened" to be deemed a substantially completed offense.

Similarly, in *United States v. Medina*, 74 F.3d 413, 418-19 (2d Cir. 1996), the Second Circuit upheld the denial of the reduction where the conspirators had taken steps to prepare for a robbery. They obtained a floor plan of the target premises, selected a date when large sums would be on the premises, procured firearms, masks, and restraints, drove to the location and approached the door. The police stopped them before they could enter and complete the substantive crime. But the Second Circuit held that the conspirators had been "about to complete" the robbery, even if they were not "about to succeed," and the reduction was not applied. *See also United States v. Chapdelaine*, 989 F.2d 28, 36 (1st Cir. 1993) (cited in *Medina*)

("[N]ear accomplishment of the criminal object normally poses enough risk of actual harm, and reveals enough culpability" to defeat "the reduction available for conspiracies . . . that have not progressed very far"; a scheduling miscalculation doomed a robbery conspiracy but no reduction given when the robbers arrived with guns and disguises in tow); *United States v. Deas*, 768 F. App'x 81, 83 (2d Cir. 2019) (no § 2X1.1 reduction where defendant showed up for a robbery with a gun and mask expecting to go to the home of the target; his associate was an informant so the crime did not take place).

The facts in this case show that the conspiracy here was substantially completed and close to fruition; thus, the reduction under § 2X1.1(b)(2) does not apply. Members of the conspiracy, including Faiq, Iza and James Schwab, had arranged for a group to travel from St. Louis to Connecticut and had procured lodging for them in an expansive home, with a large basement, secluded in the woods, a place that could serve as a holding location for V.C.'s parents once abducted. They obtained vehicles for them, including a large cargo van, and other supplies--a laptop, air rifles and cartridges, walkie-talkies, and duct tape. Iza prepped the group on what to do to gain control of the cryptocurrency V.C. controlled and sent Faiq wallet addresses where the cryptocurrency should be sent, which Faiq then provided to his co-conspirators on the ground. PSR at 14, ¶ 42. The group spent nearly two days stalking the victims' home and following R.C. and S.C. as they drove around Danbury, scouting for the best place to grab them. Members of the conspiracy knocked repeatedly on the door of the unit they believed was the victims' residence to force their way inside, *Id.* at ¶ 44, and changed the plates on the van so that it could not be tracked by law enforcement once the crime was done. *Id.* at 16, ¶ 50. Iza gathered intel about the correct unit number and disclosed it to Faiq and the others in Danbury, sending Angel Borrero back to the victims' neighborhood to confirm. *Id.* All these actions were taken while Faiq and the

crew from St. Louis was in Connecticut, and this conduct alone indicates that the conspiracy "came close enough to fruition," *Luchtman*, 910 F.3d at 39 (internal citation omitted), to preclude a reduction under § 2X1.1.

Thereafter, the conspiracy continued apace. Borrero exchanged vehicles with Faiq, solicited others to come to Connecticut, Iza and Schwab financed their travel, they purchased metal bats, hammers, and zip ties, and, for a day and a half, they conducted surveillance of the victims' home and location, seeking an opportunity to abduct V.C.'s parents. They did in fact carjack, assault, restrain, and abduct the parents, throwing them in the van and intending to take them to the Airbnb rental in the woods and hold them for ransom, that is, approximately $50 million in Bitcoin. They were stymied by police, who had been alerted to the crime by 911 callers and an off-duty FBI supervisor, and chased down the van before it could reach its destination. These facts show that the crime contemplated by the conspirators was nearly completed and likely would have succeeded but for interruption and apprehension by law enforcement. By its terms, and under applicable caselaw, § 2X1.1(b)(2) does not authorize any decrease in offense level.

In sum, the evidence and the law fully support the application of the enhancements set forth in the plea agreement, and the only decrease that is applicable is that for acceptance of responsibility. The Government respectfully submits that total offense level should be 29.

## III. ARGUMENT

Other than the arguments already addressed above, the defendant cites two reasons in support of his request for a sentence of time served. First, he claims that the idea of incremental punishment should lessen his sentence – that the lenient treatment he received in state court despite repeated interactions justifies further lenient treatment in this matter. Second, he asserts that he has

engaged in self-reflection and has decided he does not want to commit crimes anymore. Because of his claimed rehabilitation, he argues that a further term of incarceration is unnecessary.

The Government disagrees. The factors the Court will consider support a sentence of imprisonment beyond the defendant's presentencing detention and beyond what the PSR's calculation provides. The nature of the crime, the defendant's role in that crime, the need for just punishment, the need for deterrence, the need to promote public safety, and other factors weigh in favor of the sentence the Government has requested.

As the Court is well aware, 18 U.S.C. § 3553(a) provides that "[t]he court, in determining the particular sentence to be imposed, shall consider":

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];
>
> (5) any pertinent policy statement [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

The Government addresses the weight of these factors below.

### A. Providing Just Punishment -- The Nature, Circumstances and Seriousness of the Offense and the Defendant's History

By now, this Court understands the heinous, exceedingly violent nature of the crime in this case. The targeted family were surveilled and literally stalked for several days as the perpetrators sought the opportune moment to strike at them. The plan always anticipated violence from every angle—whether it involved a home invasion where the parents and their son were assaulted and restrained inside their residence, or the violent abduction of the parents away from home to force their son to disgorge millions in stolen cryptocurrency to those who were greedily seeking what was never theirs. From the beginning, the conspirators intended to use weapons and restraints-- air rifles, metal bats, zip ties, duct tape. And, when they did take action against the victims, they employed extreme physical violence and inflicted severe bodily and emotional trauma. Everything about this case shows an utter contempt for the constraints of the law and the norms of society, and a callous disregard for the safety and well-being of other people.

Saif Faiq was part of the conspiracy from an early stage, at least in part because he was Iza's brother. Literally within a day the large Bitcoin theft was revealed, Faiq had the targets' Danbury address, recruited those he knew had gang associations and would be willing to use violence, promised them a substantial sum of money to entice their participation, gathered their personal information, and communicated it to Schwab so that airline tickets could be purchased.[3] He drove them to the airport, flew with them to Westchester, arranged their transport to an Airbnb in Connecticut, and told them the plan which involved the restraint of and violence against the victims. He sent them out to get

[3] The timing of his involvement contradicts his claim to Probation that he "initially did not agree" to participate in the conspiracy. PSR at 32, ¶ 128.

vehicles and supplies and ensured that his name was not on anything. He conducted surveillance, staying in consistent communication with Iza, and directed the others to do as Iza said while keeping an eye on them. Faiq was quite comfortable with violence; he just wanted the others to be front and center and at risk rather than he. He would confirm the transfer of the cryptocurrency others forced V.C. to divulge, and he would profit from their efforts.

Faiq also had no qualms about the abduction of V.C.'s parents when that option seemed the most viable way to force V.C. to transfer the cryptocurrency. When his associates expressed concern about the kidnapping, realizing that they would be taking a risk Faiq would not share, Faiq tried in various ways to persuade them to stay on course. He told them Iza would pay them well for their efforts and assured them he had the resources to do so. He held onto their belongings. He threatened that "the dude" had their personal information and could take steps to retaliate against them. Violence and abduction of the parents were acceptable to Faiq—he just wanted others to do the heavy lifting.

And he was aware that others would come to finish what he had started. He foresaw the harm that would be inflicted on the victims and had no problem with it. His role, his intent, and his agreement to an exceedingly violent and insidious crime weigh heavily in favor of a substantial sentence of imprisonment.

This case is the most serious one Faiq has committed but it is not his first involvement in criminal conduct or interaction with the justice system. While in high school, he was suspended for 170 days for extortion and assault against his classmates. PSR at 32, ¶ 129. Then in 2021, when he was 18 years old, he was arrested on nearly a weekly basis in July and August. PSR at 28-29, ¶¶ 114-116. The charges involved his use

and possession of firearms and ammunition, his unlawful use of identification documents, and his obstruction of and interference with police. *Id.* Certain of these cases were pending at the time of his arrest in the instant case. According to the bail report prepared at his federal arrest in St. Louis, a case was filed against him in October 2021 for an order of protection, but the victim chose not to pursue it further. Faiq left St. Louis that year and lived in California with his brother for a year and a half. PSR at 30, ¶ 119. When he returned to St. Louis, he re-commenced his contact with state authorities with arrests in March 2023 for resisting/interference (¶ 117), in May 2023 for risk of injury, gun and drug charges, and others (¶ 107), and in December 2023 for resisting/interference (¶ 108). Faiq was sentenced on the May and December charges on April 11, 2024, receiving a suspended sentence and probation. PSR at 27, ¶¶ 107-08. Consequently, he was on probation when he participated in the conspiracy at issue in this case. The defendant's history, from high school forward, shows that he is in strong need of deterrence. Neither a 6-month suspension in high school for assault and extortion nor suspended sentences and terms of probation thereafter have led to any serious effort on his part to abide by the law. And his conduct in this case demonstrates that he poses a significant risk to other people.

One of the most important considerations in this case is just punishment for the defendant's crimes. 18 U.S.C. § 3553(a)(2)(A). The scheme Faiq helped manage and direct took place over several days. Not only did he travel from St. Louis to Connecticut in violation of his probation, but while here, he stalked the intended victims, monitored his co-conspirators, and pushed them to do the violent acts Iza directed, all out of greed. The conspiracy's fallout was immense. The victims were brutally attacked and terrorized, they lost their jobs and income, and their lawful status in this country. Their future is uncertain,

and emotionally they have not recovered and may never be whole again. The need to justly punish this brazen and horrific crime weighs heavily in favor of a significant sentence.

The defendant claims to Probation that he has been rehabilitated, but there is little to no evidence in the record to support the assertion. Nothing indicates a previously productive lifestyle. He was a regular marijuana user, PSR at 31, ¶ 125, and has never held a job. *Id.* at 32, ¶ 130. He claims that he has bought and sold cars, but that has not been verified nor any indication given for how he funded such ventures. During his time at Wyatt, he has received a single certificate (for anger management). PSR at 5, ¶ 8. He says he has goals, but there is no constructive plan. Particularly for someone with this defendant's history, rehabilitation requires more than words, and his claim in this regard does not justify a lower sentence.

B. <u>The Need to Promote Respect for the Law, to Provide Adequate Deterrence, and to Protect the Public</u>

Each of these factors weighs heavily in favor of a sentence within the Guideline range as calculated by the Government. This case has garnered much publicity, and violence like that in this case appears to be a feature of the criminal cryptocurrency community. Victims like the ones here are seen as easy targets, given that they cannot readily summon law enforcement. The financial rewards are believed to be quite high, and the prospect of substantial reward exponentially increases the risk of violence. A significant sentence of imprisonment would show that the consequences of engaging in this type of criminal activity are severe. The sentence here will serve as a much-needed wakeup call, not only to the defendants in this case but to others who are monitoring it. And many people are monitoring what happens in this case.

Thus, the objectives of deterrence and of protecting the public are best served by a sentence commensurate with the crimes here. Moreover, as noted above, the defendant has

shown little respect for the law to date. The sentence imposed in this case should account for that.

Accordingly, the Government submits that the need for specific and general deterrence, to promote respect for the law, and to protect the public from future crime weigh strongly in favor of a sentence within the Guideline range as calculated by the Government.

C. The Need to Avoid Disparate Sentences

The charged conspiracy in this case is atypical in certain respects. Conspirators traveled across the country to participate. The crime took substantial planning and lasted for days. The object justified the time, effort, and expense in the eyes of the conspirators, given the value of the cryptocurrency and the vulnerability of the target. And, the violence anticipated and ultimately inflicted on a middle-aged couple with no involvement in the underlying scheme was hands-on and extreme. Thus, it is likely that few defendants are similarly situated. In any event, courts seek to avoid nationwide sentencing disparities for similar crimes and similar criminals. *United States v. Saez,* 444 F.3d 15, 18 & n. 2 (1st Cir. 2006) (citing cases). Defendants similarly situated to this defendant should and would be facing substantial prison sentences, consistent with the Guidelines range requested by the Government.

CONCLUSION

For the foregoing reasons, the Government respectfully submits that the facts of this case, the circumstances of this defendant, the sentencing factors set forth in 18 U.S.C. § 3553(a), and the law governing sentencing all fully support a sentence of imprisonment as calculated by the Government.

Respectfully submitted,

DAVID X. SULLIVAN
UNITED STATES ATTORNEY

/s/

KAREN L. PECK
ASSISTANT U.S. ATTORNEY
Fed Bar No. CT14959
1000 Lafayette Blvd, 10th Floor
Bridgeport, CT 06604
(203) 696-3000
Karen.Peck@usdoj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 21, 2026, a copy of the foregoing Government's Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

__________//s//__________
KAREN L. PECK
ASSISTANT UNITED STATES ATTORNEY